**STATE of Delaware**

v.

**Sadiki J. GARDEN, Defendant**

Superior Court of Delaware,
New Castle County.

Submitted: Feb. 12, 2001.

Decided: March 15, 2001.

Mark W. Bunitsky, and Caroline L. Cross, Deputy Attorneys General, Wilmington, Delaware, for the State.

Brian J. Bartley, Timothy J. Weiler, and Aaron Goldstein, Wilmington, Delaware, for the Defendant.

### SENTENCING OPINION
JOHN E. BABIARZ, Jr., Judge:

Defendant Sadiki Garden was convicted by a jury on three counts of First Degree Murder for the killing of Denise L. Rhudy during an attempted robbery. Count I of

the indictment charged Garden with intentional murder in violation of 11 *Del. C.* § 636(a)(1); Count II, with recklessly causing Rhudy's death during the commission of a felony, namely Attempted First Degree Robbery in violation of § 636(a)(2); and Count III, with causing her death with criminal negligence during the commission of Attempted First Degree Robbery in violation of § 636(a)(6).

Under 11 *Del. C.* § 253 a finding of intentional conduct satisfies the element of recklessness or criminal negligence. Thus, on Counts II and III the jury convicted the defendant of the same crime; namely, intentionally killing Denise Rhudy during and in furtherance of an Attempted Robbery First Degree. Title 11 *Del. C.* § 206 prohibits conviction on two offenses where the offenses are established by proof of the same facts. Count III, having the less culpable state of mind, is therefore merged into Count II. The Court will sentence Defendant for First Degree Murder on Counts I and II.

The Delaware capital punishment statute, 11 *Del. C.* § 4209, provides that a defendant is not eligible for capital punishment unless at least one of twenty-two specified aggravating circumstances is established beyond a reasonable doubt. Included among these is that the murder was committed "while the defendant was engaged in the commission of, or attempt to commit ... any degree of ... robbery...."[1] In addition, § 4209(e)(2) provides that whenever a defendant "has committed a murder in the first degree in violation of any provision of § 636(a)(2)–(7) ... that conviction shall establish the existence of a statutory aggravating circumstance." Defendant's conviction of First Degree Murder on Count II of the indictment therefore establishes his eligibility for the death sentence.

The death sentence shall be imposed by the Court if it finds:

> by a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears on the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist.[2]

If the Court does not so find, then the Court must impose a sentence of life in prison "without benefit of probation or parole or any other reduction."[3]

The Court's determination of this issue is preceded by a hearing involving the same jury that convicted the defendant. This hearing is a bench trial with an advisory jury, since the jury is asked only to recommend a finding as to whether the aggravating circumstances outweigh the mitigating circumstances. Moreover, the jury's recommendation need not be unanimous. Instead, the jury reports its final vote on whether the aggravating circumstances outweigh the mitigating circumstances.

In this case the jury recommended a finding that the aggravating circumstances did not outweigh the mitigating circumstances by a ten to two vote on Count I and by a nine to three vote on Count II. This recommendation is not binding on the Court. The statute requires only that the Court "consider" the jury's recommendation in arriving at its sentencing decision.[4]

---

**1.** § 4209(e)(1)j.

**2.** § 4209(d)(1)b.

**3.** § 4209(d)(2).

**4.** § 4209(d)(1).

In its first decision construing the Delaware capital punishment statute as revised in 1991, the Delaware Supreme Court held that the Delaware Constitution, like the United State's Constitution, did not grant a defendant the right to have a jury determine punishment in a capital case.[5] The Court found that at common law sentencing was a judicial function and the jury's role was to decide the factual question of guilt or innocence. It found this principle to be so "deeply rooted in precedent as to be immutable."[6]

Consistent with this principle of Delaware constitutional law, the Supreme Court has repeatedly emphasized the dominant role of the trial judge in determining a capital sentence. For example, in *Lawrie v. State*, the Supreme Court described the judge's sentencing role as follows:

> The trial judge is vested with ultimate sentencing authority. The jury's function is purely advisory. The trial judge may completely reject the recommendation of the jury.[7]

In *Gattis v. State*, the Supreme Court reemphasized the trial court's independent role in capital sentencing:

> While the trial judge must consider the recommendation of the jury, he or she functions independently in deciding whether to impose the death penalty or life imprisonment....[8]

In *Wright v. State*, the Supreme Court stated:

> [T]he Superior Court bears the ultimate responsibility for the imposition of the death sentence while the jury acts as an advisory capacity 'as the conscience of the community.'[9]

More recently, in *Dawson v. State*, the Delaware Supreme Court considered a challenge to the capital punishment statute which asserted that it was unconstitutional because it failed to prescribe the weight to be given to the jury's advisory verdict.[10] The Court rejected the challenge on the authority of *Harris v. Alabama*,[11] which held that the federal constitution did not require a State to define the weight to be given to an advisory jury verdict.[12]

Alabama's capital punishment statute, like Delaware's, provides only that the trial judge consider the advisory verdict. And the Alabama Supreme Court, like Delaware's, has held that the statute means nothing more than it says.[13]

Significantly, the Delaware Supreme Court did not adopt the Florida standard for review of an advisory capital sentencing verdict.[14] This standard requires that, in order to reject a jury recommendation for life, "the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ."[15] Alabama has expressly rejected the Florida test, finding that it was clearly

---

**5.** *State v. Cohen*, Del.Supr., 604 A.2d 846, 851–852 (1992).

**6.** *Id.*

**7.** Del.Supr., 643 A.2d 1336, 1345 (1994).

**8.** Del.Supr., 637 A.2d 808, 822 (1994).

**9.** Del.Supr., 633 A.2d 329, 335 (1993) (citation omitted).

**10.** Del.Supr., 673 A.2d 1186 (1996).

**11.** 514 U.S. 1078, 115 S.Ct. 1725, 131 L.Ed.2d 583 (1995).

**12.** *Dawson v. State,* 673 A.2d at 1196.

**13.** *Ex parte Jones,* Ala.Supr., 456 So.2d 380(1984).

**14.** *For a contrary opinion of the Superior Court see, State v. Flagg,* 1999 WL 743458 (Del.Super.).

**15.** *Tedder v. State,* Fla.Supr., 322 So.2d 908, 910 (1975).

contrary to the Alabama statute which, as noted previously, is similar to Delaware's. Finally, it should be noted that the position of the Delaware and Alabama Supreme Courts finds support in a comment of the U.S. Supreme Court in *Proffitt v. Florida:*

> [j]udicial sentencing should lead, if anything, to even greater consistency in the imposition at the trial court level of capital punishment, since a trial judge is more experienced in sentencing than a jury, and is therefore better able to impose sentence similar to those imposed in analogous cases.[16].

■ ■ The advisory verdict, which need not be unanimous, is therefore nothing more than its name implies: an aid to the trial judge in forming the ultimate judgment. In close and difficult cases, it should guide the trial judge to a sentence consistent with the verdict. But it is not a shackle to inhibit the Court from the independent exercise of the duty imposed on it by law.

In the case at bar, the penalty jury was instructed that the Court would give its verdict "great weight." This was done to emphasize to the jurors the importance of their recommendation. Without the assurance of such an instruction the Court would be unable to give the verdict the proper consideration required by statute. In this case, the jury deliberated for nearly eight hours spread over two days. The Court appreciates the conscientious effort these twelve citizens gave to the discharge of their duty. They did not take the task lightly. The Court understands the verdict to be the honest and careful personal judgment of each member of the jury on three difficult and important questions:

what aggravating circumstances exist, what mitigating circumstances exist and which outweighs the other.

■ ■ The Court does not take the jury's answers to these questions as an expression of the "conscience of the community." This phrase, injected into our jurisprudence by the U.S. Supreme Court in *Witherspoon v. Illinois,*[17] has become hollow. No one who truly wanted to know the conscience of the community would use the capital jury selection process to ascertain it. This process systematically excludes significant elements of the community, persons who have strong views, pro or con, regarding the death penalty.[18] The Court also usually excuses many other persons who would experience hardship by being required to serve in a lengthy capital trial or who would be unable to be sequestered during deliberations. And the remainder are filtered through a peremptory challenge procedure which allows both sides to use unstated biases or suppositions to exclude jurors with only minimal controls by the Court. No twelve persons selected by such a process can be expected to reflect the conscience of the community.

In addition, the jury is not instructed to reach a decision based on public opinion but rather to reach an individual judgment based on the evidence and the law. More importantly, the jury is told to disregard any perception of public opinion in coming to a verdict. In short, it is told to adhere to the same standards that apply to the Court.

The Court has given substantial consideration to the recommendation of the jury. But, like all jury verdicts, it is opaque. The Court does not know what aggrava-

---

16. 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

17. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

18. *See Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *DeShields v. State,* Del.Supr., 534 A.2d 630, 634 (1987).

ting and mitigating circumstances were found to exist other than the statutory aggravating circumstance. And the Court does not know what process of logic each juror used in weighing the circumstances. Since the verdict is non-unanimous and non-binding on the Court, it would be incorrect to consider it like a unanimous binding verdict; i.e., to draw all inferences consistent with the majority vote of the jury. As noted previously, the statute requires the independent judgment of the Court.

Unlike the jury process, the judicial decision making process is transparent. The Court must make findings of fact and must set forth the reasoning by which it reaches its ultimate conclusion.[19] This process enables the public to see for itself that justice is not administered arbitrarily or capriciously, but in accordance with the law. It is by this process that the Court considers the recommendation of the jury.

■ Under the statute, the Court may only consider aggravating and mitigating circumstances which it has found to exist. The requirement of specific findings was added in the 1991 version of the law. Statutory aggravating circumstances must be proven beyond a reasonable doubt.[20] The weighing of all factors found to exist is governed by a preponderance of the evidence standard.[21] The statute is silent, however, on the burden of proof for non-statutory aggravating factors and mitigating factors. The Delaware Supreme Court has approved the use of a preponderance of the evidence standard for mitigating circumstances,[22] and has rejected the rea-

sonable doubt standard for non-statutory aggravating circumstances.[23] By implication, the proper burden of proof for non-statutory aggravating circumstances is preponderance of the evidence.

All findings made by the Court as to non-statutory aggravating circumstances and mitigating circumstances will be by a preponderance of the evidence.

## THE SENTENCING DECISION

The Delaware capital punishment statute requires the Court to consider "all relevant evidence in aggravation and mitigation which bears on the particular circumstances or details of the commission of the offense and the character and propensities of the offender"[24] in determining the existence of particular aggravating or mitigating factors. Aggravating circumstances are those which make the imposition of the death penalty appropriate. Mitigating circumstances are those which make the imposition of a sentence of life in prison without probation, parole or other sentence reduction appropriate.

### 1. The Crime.

Denise Rhudy was murdered by Sadiki Garden during an attempted robbery. She had driven with two friends, Stephanie Krueck and John Weilbacker, to downtown Wilmington to visit a bar and restaurant where a co-worker was performing in a band. She parked her car in a well-lit parking lot and as the group began to exit the vehicle they were accosted by Garden

---

19. § 4209(d)(3) provides that when the Court imposes a death sentence, "it shall set forth in writing its findings upon which the sentence of death is based."

20. § 4209(d)(1)a.

21. § 4209(d)(1)b.

22. *Weeks v. State*, Del.Supr., 653 A.2d 266, 271–272 (1995).

23. *Dawson v. State*, Del.Supr., 637 A.2d 57, 64 (1994).

24. § 4209(d)(1)b.

and co-defendant Christopher Johnson. Stephanie Krueck exited the vehicle first from the front passenger seat. Garden quickly approached her, pressed a .25–caliber semi-automatic pistol to her side and demanded money. Christopher Johnson stood to the rear of the vehicle as a lookout.

■ When Krueck said she had no money, Garden turned his attention to John Weilbacker, who had exited the left rear of the vehicle. Garden pointed his gun at Weilbacker, demanded money and was refused. Garden then leaned into Rhudy's vehicle where she was still seated in the driver's seat, pointed the pistol at her and demanded money. She refused and Garden shot her twice. One bullet pierced her chest, the other her neck. Each wound alone would have been fatal. Denise Rhudy died within minutes of being shot. The Court finds that the State proved beyond a reasonable doubt the aggravating circumstance that the murder was committed while the defendant was engaged in an attempted robbery.[25]

■ Garden then ran from the scene with Johnson ahead of him. Garden stopped, however, a few feet from the rear of the car, turned and fired a shot at Krueck. The bullet pierced her coat sleeve without touching her body. The jury found Garden not guilty of attempting to murder Krueck, perhaps because it had a reasonable doubt as to his intent. The Court finds it at least probable that he intended to kill her and finds this to be a non-statutory aggravating circumstance.

■ Denise Rhudy was 36 years old when she was murdered. She was recently divorced, under amicable circumstances, from Gary Rhudy, and left four children, aged 14 years to 16 months. By all accounts she was a devoted parent and her children will sorely miss her. She was also survived by her father and mother, with whom she was extremely close. They spoke every day. Her closest friend Stephanie Krueck witnessed her die. Like most people, Denise Rhudy was a good person. And when a good person is murdered the pain spreads wide like the ripples from a stone cast into a still pond.

Sadiki Garden did not know Denise Rhudy and could not know the pain he would cause. But when one chooses to commit a random murder, he is fully responsible for the likely consequences of the act, the death of a good person. The impact of Denise Rhudy's death on those around her is an aggravating circumstance.

Three aggravating circumstances are associated with the crime. There are no mitigating circumstances.

## 2. The Defendant.

■ Garden was 24 years old at the time of the offense and had amassed a significant criminal record. On the surface his criminal record does not appear particularly noteworthy—three convictions for receiving stolen property, a felony, and one conviction for unlawful use of a credit card, a misdemeanor. However, on closer examination each felony offense had serious elements of violence and premeditated lawlessness.

The first two of the receiving stolen property charges involved the theft of automobiles using burglary tools. Each time, when approached by police officers for traffic violations, Garden fled, leading police on a chase on city streets. Each chase ended in a collision, with Garden attempting to flee on foot and struggling with arresting officers.

---

**25.** § 4209(e)(1)j.

The third receiving stolen property had more ominous undertones. On November 30, 1995 Wilmington police officers observed a stolen vehicle in a service station. It was occupied by four persons including Sadiki Garden. On approaching the vehicle the occupants attempted to flee. Two were apprehended at the scene after a struggle. Both were armed. Garden and the other occupant escaped but were quickly identified.

On December 1, 1995, the police executed a search warrant on Garden's apartment. Garden was not there but two loaded guns were seized from a closet. Garden was arrested later in the day and told police that the other three occupants of the vehicle planned to attack a rival gang with guns. He claimed he was unarmed, was just along for the ride, and would have been dropped off before the fight.

Garden was allowed to plead guilty to receiving stolen property and was sentenced to one year of incarceration. I find Garden's criminal history to be an aggravating circumstance of considerable weight.

■ While in prison, Garden made friends with co-defendant Christopher Johnson and continued that friendship after their release. That friendship ultimately led to the crimes before the Court.

On the night before the Rhudy murder, Garden and Johnson were together in Garden's apartment, which was near where Rhudy was shot. Garden needed a few hundred dollars to complete the purchase of a car and he suggested that they commit a robbery. They walked around downtown Wilmington until they spotted Vincent Marge and Karen Hama in the same parking lot where Rhudy was shot. Garden had given Johnson his gun, a .25 caliber semi automatic and Johnson used it to rob Marge and Hama. They got less than

$200 in cash and some credit cards. Garden took the cash for himself and went to a department store with Johnson and another acquaintance James Hollis where they used the credit cards to purchase merchandise.

The next night Garden, Johnson and Hollis were again together in Garden's apartment. This time they needed money to attend a party and decided to rob again in the same place. Hollis, who did not participate in Friday night's robbery, went along ostensibly as a lookout who remained in Garden's newly purchased vehicle. Garden and Johnson went into the same parking lot, this time with Garden holding the weapon. As a result of this criminal enterprise Denise Rhudy died. Garden's persistent criminal conduct is also an aggravating circumstance.

■ Following the shooting, Johnson and Garden returned to Garden's car where Hollis awaited them and then went to the party. Asked what happened, Garden said "I shot the bitch because she wouldn't give it up." The group then partied until late when Garden and Johnson got into a fight during which Garden took a shot at Johnson but missed.

The trio was arrested three days after the murder and has remained in custody since then. At no time since the murder has Garden expressed any remorse over Denise Rhudy's death. His only comment about the victim referred to her as a "bitch." He partied after the killing. None of the witnesses who were called on behalf of the defendant testified that he ever said he regretted his actions. These witnesses included members of his family as well as two mental health professionals. In allocution, other than to offer his "condolence to the Rhudy family," he spoke mainly of his present predicament and ex-

pressed no sorrow or apology for Denise Rhudy's death.

Sadiki Garden's utter lack of remorse is an aggravating factor.

■ Finally, it is worth noting that Garden has not been a model prisoner. During his incarceration for receiving stolen property he received 28 "write ups". Most of them were not for serious rule infractions but some were for disorderly and threatening behavior. During his incarceration pending his murder trial he was in three fights and was cited for possessing an open razor. Garden's inability to conform to rules, even while awaiting trial for murder, is an aggravating circumstance.

■ In mitigation, the defendant offered the testimony of two mental health professionals, Dr. S. Charles Bean, a neurologist, and Dr. Alvin L. Turner, a psychologist. Dr. Bean testified that he saw Garden on one occasion in 1987 when Gaden was eleven and a second time in August of 2000 in Gander Hill prison. Dr. Turner also saw Garden on two occasions, January 27, 2000 and January 11, 2001. Each reviewed various health and educational records of the defendant.

Taken together the testimony shows that Garden was abandoned by his father at an early age and that at 23 months of age he was stricken with a life threatening disease, hystocytosis X, which was not resolved until he was seven or eight. This disease required extensive and debilitating chemotherapy which caused his mother and his aunts, who helped raise him, not to impose discipline on him. As a result he developed significant problems during his schooling through high school which ended when he was in the eleventh grade.

These problems included difficulty learning, difficulty handling adult authority, and a short temper. Interestingly his intelli-

gence progressed from well below normal in 1981 to near normal in 1990. Following his high school drop-out, he earned a GED and began working at various jobs apparently successfully.

A physical examination by Dr. Bean in August 200 showed no organic brain damage and no other physical abnormalities.

Dr. Turner opined that Garden suffered from a "personality disorder not otherwise specified," a disorder which he said involved the presence of traits of several different personality disorders without meeting the criteria for any specific personality disorder. Neither witness testified that the defendant suffered from any impingement on his ability to refrain from wrongful conduct or to appreciate its wrongfulness. Defendant's behavior is entirely consistent with an amoral person unwilling to conform his behavior to society's norms. Defendant has not proven by a preponderance of the evidence that he suffered from a psychological disorder which diminished his culpability for the crime he committed. In legal terms he has not proven this mitigating circumstance.

■ The defense alleges as a mitigating factor that Garden was successful in complying with the terms of his various probationary sentences. In fact, he did comply with probationary restrictions in many respects and was discharged early from his last probationary term, the one following his incarceration for the 1995 Receiving Stolen Property conviction. This contention is refuted, however, by his violation of every probation, except the last, by virtue of committing a new offense. If there is anything a probationer must not do, it is commit a new crime. And, even though discharged early from his last probation he went on to commit the ultimate

crime. This claim of mitigating circumstance is not proven.

■ Sadiki Garden has a decent work history. Although its full extent is not completely documented, his last employer testified that he was hard working, able and loyal. This is a mitigating circumstance.

■ Sadiki Garden's family loves him and is loyal to him. This also is a mitigating circumstance because it shows, by inference, some good aspects to his character.

■ Defendant alleges his age as a mitigating factor. He was 24 when he killed Denise R. Rhudy. At that age, any person should appreciate the value of life. This is not a mitigating factor.

■ Constance Webster, Garden's girlfriend, testified that Garden provided her and her children with financial and emotional support. This would be a mitigating factor if it were true, but the Court has some doubt. Garden borrowed money from her to partially finance the car which he bought the day of Rhudy's murder. She signed the financing documents with him and all of Garden's paychecks for several weeks before the purchase of the car were saved for that purchase and no part was paid to Webster. He gave her a stereo which was purchased with the credit card stolen from Karen Hama. If Garden's relationship with Constance Webster is a mitigating factor, it is of minor significance.

■ Garden argues that the plea bargains offered to and accepted by Christopher Johnson and James Hollis are mitigating factors. Hollis pleaded guilty to Attempted Robbery First Degree, Possession of a Firearm During the Commission of a Felony and Conspiracy Second Degree with a sentence limitation of 5 to 10 years in the discretion of the Court. Hollis is a one-legged man whose ability to participate in an armed robbery is very limited. The Court is convinced that he was not an instigator of the crime and that it would have occurred even if he had not agreed to tag along with Garden and Johnson. His modest culpability is fairly reflected in his plea bargain.

Johnson pleaded guilty to all charges in the indictment and will be sentenced to life in prison without probation, parole or the possibility of sentence reduction. He was a principal player in the crime and it probably would not have occurred without his participation. However, it is clear that he did not fire the gun that killed Denise Rhudy and that killing her was not part of the plan of robbery. This difference justifies the State's decision not to seek the death penalty for him. Garden suggests that he was acting under the influence of Johnson at the time of the offense. This would be a mitigating circumstance if true, but Garden produced no evidence to support the contention.

## CONCLUSION

■ The Court has found substantial circumstances which justify the imposition of the death penalty. They include the fact that the defendant killed Denise Rhudy during an attempted robbery and probably attempted to kill Stephanie Krueck during the same robbery, the fact that Denise Rhudy was a good person, the fact that defendant has a criminal record involving premeditated lawlessness with an undercurrent of violence, the fact that the night before Rhudy's murder the defendant participated in another armed robbery under similar conditions, the fact that the defendant has no remorse for killing an innocent woman and the fact that the defendant has not shown the ability to conform his conduct either to the rules

imposed in an open society or the rules imposed in prison.

The mitigating circumstances proved by the defendant are insubstantial by comparison. They show only a modest ability to function normally in the community. The ability to hold a job and to enjoy the love of family are foundational characteristics which cannot outweigh a fundamental disregard for life. The Court will impose a sentence of death.