**STATE of Delaware**

v.

**Sadiki J. GARDEN, Defendant.**

Superior Court of Delaware,
New Castle County.

Submitted: April 21, 2003.
Decided: May 7, 2003.

Mark W. Bunitsky, and Caroline L. Cross, Deputy Attorneys General, Wilmington, DE, for the State.

Brian J. Bartley, and Timothy J. Weiler, Office of the Public Defender, Wilmington, DE, for Defendant.

## SENTENCING OPINION ON REMAND

BABIARZ, Judge.

Sadiki Garden was convicted by a jury of two counts of first degree murder for killing Denise Rhudy during an attempted robbery. Following a penalty hearing, the jury recommended a finding that mitigating circumstances outweighed aggravating circumstances by a vote of ten to two on the intentional murder count and nine to three on the felony murder count. In accordance with the Delaware capital sentencing statute;[1] the Court considered that recommendation but in the exercise of the separate duty imposed by statute[2] concluded that the aggravating circumstances associated with the crime and the defendant outweighed the mitigating circumstances and sentenced Garden to death.[3]

The Supreme Court of Delaware affirmed Garden's conviction, but vacated his sentence, holding that this Court did not apply the proper standard in determining the sentence.[4] The case was remanded for reconsideration of the sentence. This is the Court's decision on remand.

The Court's original sentencing decision was based, first, on the unambiguous language of Delaware law which gives the jury the function of recommending a finding to the Court,[5] but vests the final sentencing authority in the trial judge and articulates the standards to be used in determining sentence.[6] Second, the Court relied on a series of consistent pronouncements made by the Delaware Supreme Court that the sentencing authority of the trial judge was paramount.[7] This series of decisions began with State v. Cohen,[8] a decision before trial on certified questions

---

1. Del.Code Ann. tit. 11, § 4209 (2001).

2. Id. at § 4209(d).

3. State v. Garden, 792 A.2d 1025 (Del.Super.Ct.2001), erroneously cited as "Mem.Op." in Garden v. State, 815 A.2d 327 (Del.2003). See Supreme Court Rule 14(g)(i).

4. Garden v. State, 815 A.2d 327 (Del.2003).

5. See Del.Code Ann. tit. 11, § 4209(c) (2001).

6. See id. at § 4209(d), which provides as follows:

Determination of sentence.—(1) A sentence of death shall be imposed, after considering the recommendation of the jury, if a jury is impaneled, if the Court finds:
a. Beyond a reasonable doubt at least 1 statutory aggravating circumstance; and

b. By a preponderance of the evidence, after weighing all relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender, that the aggravating circumstances found by the Court to exist outweigh the mitigating circumstances found by the Court to exist. (Emphasis added.)

7. State v. Cohen, 604 A.2d 846 (Del.1992); Gattis v. State, 637 A.2d 808, 822 (Del.1994) (emphasizing that "[w]hile the trial judge must consider the recommendation of the jury, he or she functions independently in deciding whether to impose the death penalty or life imprisonment...."); Lawrie v. State, 643 A.2d 1336 (Del.1994); Wright v. State, 633 A.2d 329 (Del.1993).

8. 604 A.2d at 846.

of law, in which the Supreme Court considered the meaning and constitutionality of the then newly enacted capital sentencing statute which governs this case. In *Cohen*, the Supreme Court found the statute to be clear and unambiguous and declared the principle of judicial sentencing to be "immutable."[9] In discussing the issues raised by the new law, the *Cohen* Court stated that "the jury now functions only in an advisory capacity."[10]

Subsequent to the sentencing opinion in this case, the Supreme Court reaffirmed this principle in *Capano v. State*[11] and, more importantly, in its recent decision in *Brice v. State*.[12] Like *Cohen; Brice* was an opinion written prior to trial answering certified questions of law regarding the scope and constitutionality of an amendment to the capital sentencing statute. In one of its answers, the *Brice* Court affirmatively stated that the trial judge was charged with weighing aggravating and mitigating factors and had final responsibility for the sentencing decision:

> Under the 2002 Statute the sentencing judge *retains exclusive* responsibility for weighing aggravating and mitigating factors and for the ultimate sentencing decision.[13]

The *Brice* Court further stated that the judicial weighing process "ensures that the punishment imposed is appropriate and proportional,"[14] a point made by this Court in its sentencing decision.[15]

The *Brice* Court described the roles of the judge and jury in this fashion:

> Under the 1991 Statute, Delaware juries had an advisory role in the penalty phase and *merely made recommendations* to the judge regarding (1) the existence of aggravating circumstances, and (2) whether the aggravating circumstances found to exist outweighed the mitigating circumstances, if any, found to exist. While the judge would expressly inform the jury that its recommendation would be accorded "great weight" their [sic] role was nevertheless advisory.[16]

The *Brice* Court also quoted the synopsis of the bill amending the statute to underscore the judge's role as the final arbiter of the appropriate sentence:

> The Court will *continue* to be responsible for ultimately determining the sentence to be imposed, after weighing all relevant evidence presented in aggravation or mitigation....[17]

The *Brice* opinion thus reaffirmed the consistent rulings which began with *Cohen* and also acknowledged that the Delaware legislature had the same understanding.

The Supreme Court issued *Brice* on January 16, 2003. Eight days later, on January 24, 2003, the Court issued *Garden v. State*, affirming Sadiki Garden's conviction but remanding the case to this Court for resentencing.[18] The *Garden* decision holds that when the jury recommends a finding that aggravating factors do not

---

9. *Id.* at 852.

10. *Id.* at 849.

11. 781 A.2d 556, 668–670 (Del.2001).

12. 815 A.2d 314 (Del.2003).

13. *Id.* at 322 (emphasis added).

14. *Id.*

15. *State v. Garden*, 792 A.2d at 1030 (*citing Proffitt v. Florida*, 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)).

16. *Brice v. State*, 815 A.2d at 324 (emphasis added).

17. *Id.* at 320 (*quoting* 73 Del. Laws c. 423 (2002), S.B. 449, Synopsis (emphasis added)).

18. 815 A.2d at 327.

outweigh mitigating factors, the trial judge must follow the jury's recommendation and impose a life sentence and may override it "only if the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ."[19]

The *Garden* decision is troubling to this Court for several reasons. First, *Garden* conflicts with the Supreme Court's rulings in *Brice* regarding the role of the judge and jury in the capital sentencing process. Under *Garden* the trial court is barred from carrying out the statutory mandate to weigh aggravating and mitigating circumstances, and the jury's recommendation is elevated to near binding status. This ruling squarely contradicts the *Brice* Court's holding that the statute provides for an advisory recommendation and vests exclusive sentencing responsibility with the trial judge. Even though these decisions were under consideration by the Supreme Court at the same time, *Garden* fails to explain why the *Brice* rulings are inapplicable in *Garden*.[20]

Of far greater importance is the fact that the *Garden* decision disregards the plain and clear command of the capital sentencing statute. In our democracy, lawmaking primacy is vested in the legislative and executive branches of government. A corollary to this principle is the tenet that courts must enforce statutes according to their plain meaning. In May 1892, this tenet was expressed by a judge of the Delaware Court of General Sessions of the Peace and Jail Delivery as follows:

> [W]here the words employed are words relative to the meaning of which there can be no doubt, then there ceases to be any trouble in interpreting a statute.[21]

Two weeks ago, on April 25, 2003, the Delaware Supreme Court reiterated the principle that the judicial role is to enforce statutory language when it is clear and unambiguous:

> This Court is not a legislative body.... We are constrained by the limitation of the statute and we may not ignore or trivialize the express statutory elements that are mandated by the General Assembly.[22]

In the 101 years that have elapsed between these two cases, *Garden* is notable for its disregard of this principle.

On occasion, a court may be required to interpret a statute. That occasion arises only when the statute is ambiguous on its face or where the application of the statute creates an ambiguity.[23] The *Garden* decision is not premised on a finding of statutory ambiguity, presumably because the Supreme Court recognized that none exists. Nor does *Garden* explain its disre-

---

19. *Id.* at 343.

20. *See Garden v. State,* 815 A.2d at 343 (observing that "[t]his standard would not be contrary to any precedent of this Court").

21. *State v. Davis,* 33 A. 439 (Del.Ct. of Gen. Ses.1892).

22. *Walton v. State,* 2003 WL 1963215, at *4 (Del.Supr.).

23. *See, e.g., Director of Revenue v. CNA Holdings, Inc.,* 818 A.2d 953, 2003 WL 1444509 (Del.Supr.); *Ingram v. Thorpe,* 747 A.2d 545, 547 (Del.2000); *Eliason v. Englehart,* 733 A.2d 944, 946 (Del.1999); *Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.,* 492 A.2d 1242, 1246 (Del.1985); *Spielberg v. State,* 558 A.2d 291, 293 (Del.1989); *Angelini v. Court of Common Pleas,* 205 A.2d 174, 176 (Del.1964) (reaffirming the principle that "[w]hen the language of a statute is plain and conveys a clear and definite meaning, courts give to the statute the exact meaning conveyed by the language, adding nothing thereto and taking nothing therefrom").

gard of the law regarding statutory interpretation.[24]

The *Garden* opinion hangs from a slender thread found in the third and final sentence of the synopsis to the bill which adopted the 1991 capital sentencing law. The sentence says, "This bill generally follows the Florida statute as approved by the United States Supreme Court."[25] Regrettably, *Garden* takes this sentence out of context and fails to mention the first two sentences, which provide as follows:

> This bill would cause the judge to make the final determination as to whether a person convicted of first degree murder should be sentenced to death or to life imprisonment. The bill provides a clear statutory framework to guide the judge and the jury would assist in the determination by rendering, after deliberations, as an advisory sentence to be imposed [sic].[26]

Although the syntax of the last clause of the excerpt is somewhat garbled, the meaning is clear. The trial judge makes the final decision after receiving an advisory recommendation from the jury. It is fitful logic, not to mention jurisprudence, to conclude that the single sentence quoted in *Garden* reflects a legislative intent to swallow whole the law of Florida, which is contrary to the plain words of the Delaware statute and contrary to the legislative intent expressed in the rest of the synopsis.

The *Garden* opinion frames the question of an override of a jury's life recommendation as an issue of first impression.[27] Proponents of the Florida standard have postulated a distinction between an override of a jury recommendation of life and an override of a recommendation of death. Although the General Assembly could easily have included such a distinction in the capital sentencing statute, it has not done so. The language of the sentencing statute pertains to any result of the weighing process. The statute does not distinguish between an affirmation of a jury recommendation and an override of a jury recommendation, other than the requirement that the judge must issue written findings if the ultimate sentence is death. Nor does it distinguish between an override of a recommendation of death versus a recommendation of life.

It is also evident that the *Garden* decision actually misapprehends the public policy of Delaware. The Court writes:

> As evidenced by the recent efforts of the Delaware General Assembly in amending 11 Del.C. § 4209, the imposition of the death penalty continues to be a matter of national debate, and the fairness of its application a source of concern particularly with respect to the role of the jury.[28]

The recent amendment to the Delaware capital punishment statute was not the product of a national debate over the death penalty, nor does it indicate that the General Assembly had reservations about the death penalty in Delaware. To the contrary, the amendment preserves the constitutionality of the capital punishment statute in the face of the United States Supreme Court's decision in *Ring v. Ari-*

---

24. The State argued this point succinctly in its Supreme Court Brief: "If the language of the statute is clear, then there is no ambiguity." State's Answering Brief at 57, *Garden v. State*, 815 A.2d 327 (Nos. 125 and 162, Consolidated).

25. *See State v. Cohen*, 604 A.2d at 857.

26. *Id.*

27. *Garden v. State*, 815 A.2d at 342.

28. *Id.* at 345.

*zona.*[29] It emphatically reaffirms Delaware's public policy on capital punishment. It was adopted less than one month after the *Ring* decision was handed down, and this Court cannot construe this prompt reaction as an attempt to water down Delaware's statute in response to capital punishment opponents nationwide.[30]

The public policy regarding the role of the jury is also clear from the amendment. The amendment shifted the final determination of the existence of a statutory aggravating circumstance from the judge to the jury in response to *Ring*. The legislature's focus in considering the amendment was thus on the role of the jury. In this Court's original decision, issued March 15, 2001, the Florida standard was clearly rejected as being a part of Delaware law. Yet the Delaware General Assembly not only did not act to reverse this Court's ruling when it amended the law, it reaffirmed the ruling by leaving the relevant statutory language unchanged.[31] More importantly, in the synopsis to the 2002 amendment, the General Assembly restated its understanding that:

> [the trial] court will *continue* to be responsible for ultimately determining the sentence to be imposed after weighing all relevant evidence presented in aggravation or mitigation.[32]

It is likewise impossible to conclude from the legislative history of the 2002 amendment that the Delaware legislature meant anything other than what it said in the plain words of the statute, namely that the jury's role is to make a recommendation, but the final decision is placed with the trial judge.

■ It is this Court's opinion that the *Garden* decision does not correctly state the law of Delaware. The orderly processes of government, however, do not allow the Court to act on its opinion. A trial court must always follow the mandate of an appellate court[33] even if firmly convinced that the appellate court erred. This is proper. Otherwise the Rule of Law would be substantially compromised. Moreover it would be disingenuous for this Court to conclude that the Supreme Court failed to follow the law and then to fail to do so itself.

■ Where the Delaware Supreme Court has incorrectly interpreted a statute, it falls to the legislature to correct judicial misinterpretation and clarify legislative intent. If the Delaware General Assembly believes that the *Garden* decision does not express the will of the people, then it should adopt an amendment to the capital punishment statute which rejects the *Garden* ruling. If it does not do so, then this Court will be satisfied that *Garden* is correct.

As directed by the Supreme Court, this Court will apply the law of Florida in

---

29. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

30. *Ring v. Arizona* was issued on June 24, 2002. In response, the Delaware legislature amended Del.Code Ann. tit. 11, § 4209, effective July 22, 2002.

31. Where the entire section was repealed when the new section was enacted, the unchanged provisions of the old section remain in continuous operation. *Harris Enterprises, Inc. v. State,* 408 A.2d 284, 286 (Del.1979)

(citing 1A Sutherland Statutory Construction § 22.33, at 191 (1972)). When sec. 4209 was amended in 2002, only the amended subsections were repealed. It follows that the legislature intended all other provisions to remain in effect.

32. *See Brice v. State,* 815 A.2d at 320 (quoting 73 Del. Laws ch. 449, Synopsis (emphasis added)).

33. *Ins. Corp. of America v. Barker,* 628 A.2d 38, 40 (Del.1993) (citations omitted).

reconsidering the sentence of Sadiki J. Garden.

The Florida capital punishment law is entered through the portal of a Florida Supreme Court decision, *Tedder v. State*.[34] *Tedder* is a remarkable decision, principally for its lack of any rationale. The operative text of the decision is easily quoted in full:

> A jury recommendation under our trifurcated death penalty statute should be given great weight. In order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ.[35]

That's it. The two quoted sentences are neither preceded nor followed by any analysis of statutory language, legislative history, statutory or common law rules of interpretation, Florida constitutional law or anything else. The decision rises like a rogue wave from a calm sea. If the *Tedder* decision were rendered by a trial court of this state, it would most likely be summarily reversed because of its failure to provide any reasoning for its holding.[36]

The consequence of adopting the *Tedder* standard is reflected in a Superior Court decision, *State v. Flagg*,[37] the only Delaware decision explicitly following *Tedder*. *Flagg* was decided by an able and esteemed jurist, Norman A. Barron, who has since retired. Although Judge Barron felt constrained to apply the law of Florida in *Flagg*, he recognized the resulting injustice. The facts of the *Flagg* case illustrate why.

Donald Flagg was convicted of breaking into the home of a married couple, murdering the husband, kidnapping the wife, holding her hostage in his home for four days, and repeatedly raping and assaulting her during her captivity. In statements made after his arrest, Flagg said he felt the urge to rape someone, saw the female victim working in her garden and acted on his urge. Evidence was also produced that, only days earlier, he had raped another woman after breaking into her home. Summarizing the crime, Judge Barron wrote:

> [The victim] went through an indescribable ordeal. Words cannot convey the horror, debasement and agony which she suffered at the hands of Donald Flagg. Indeed, Donald Flagg personifies every woman's worst nightmare. Nothing can be more cruel than being made to sleep side-by-side next to the murderer of one's spouse. The repulsive subjugation to which [the victim] was exposed for more than 100 hours marks one of the most horrifying experiences ever recounted in my courtroom.[38]

Despite the horrors of the crimes, the jury recommended a life sentence by a vote of seven to five. After finding that Florida law applied and that it required him to impose a life sentence, Judge Barron noted that without the constraint of *Tedder* he probably would have imposed a death sentence. He went on to say:

> The imposition of a life sentence in this case, based on the jury's sentencing recommendation, will be viewed in time, for

---

**34.** 322 So.2d 908 (Fla.1975).

**35.** *Id.* at 910.

**36.** *See, e.g., Shearin v. Allstate Ins. Co.,* 2002 WL 31386063 (Del.Supr.); *Ball v. Div. of Child Support Enforcement,* 780 A.2d 1101, 1105 (Del.2001) (holding that failure of a trial

judge to give reasons for a judicial disposition is a *per se* abuse of discretion).

**37.** 1999 WL 743458 (Del. Super.).

**38.** *Id.* at *24.

proportionality purposes as nothing more than an aberration.[39] Justice is not served by perpetuating aberrations.

The current state of Florida law is illustrated by a recent decision of the Florida Supreme Court in *Keen v. State*.[40] *Keen* was convicted three times for murdering his wife. The evidence at each trial showed that Keen, when single, had hatched a plot to marry a woman, heavily insure her life, and then murder her, making the death appear accidental. Keen told a confederate that this was the easiest way to get enough money to retire by age 40. In fact, Keen did marry an unsuspecting woman, insured her life, and murdered her, with the assistance of the confederate. Keen murdered his wife by pushing her off a boat fifteen miles at sea and leaving her to drown. He had considered pushing her off a high building but for an unexplained reason decided to drown her instead. He accelerated the date of the killing when he learned that his wife was pregnant.

Keen was convicted of first degree murder in his first trial. The jury recommended a death sentence and the judge imposed it. The conviction, however, was reversed by the Florida Supreme Court and Keen was tried a second time. The results were the same, a conviction, a death recommendation, and a death sentence.

This conviction was also reversed, and Keen was tried a third time. Again he was convicted, but this time the jury recommended a life sentence by a seven to five vote. The judge, however, overrode the recommendation and sentenced Keen to death.

This conviction too was reversed by the Florida Supreme Court. In addition, the Court vacated Keen's death sentence under the *Tedder* standard and held that principles of double jeopardy precluded a death sentence on Keen's fourth trial. The Court stated that the "very rigid"[41] *Tedder* standard required it to vacate the sentence, despite death recommendations by two previous juries. The Court described Florida practice under *Tedder* as follows:

> The singular focus of a *Tedder* inquiry is whether there is "a reasonable basis in the record to support the jury's recommendation of life" rather than the weighing process which a judge conducts after a death recommendation.[42]

In contrast, the Delaware statute clearly directs the judge to weigh aggravating and mitigating factors regardless of the jury's recommendation. The Florida practice is thus starkly at odds with the law of this State.

Under *Garden*, Florida law is now Delaware law and this Court is, therefore, obliged to determine whether there is any "reasonable basis in the record to support the jury's recommendation."[43] The Court's reconsideration will be guided by the general rule of *Tedder* as later clarified in *Keen*. This Court, however, does not consider itself bound by other specific Florida precedent regarding the application of its capital sentencing statute.

While the Delaware and Florida capital sentencing statutes are similar, in that each statute provides a role for both the judge and the jury, there are significant differences in the specific approach of each

---

39. *Id.* at *25 n. 85.

40. 775 So.2d 263 (Fla.2000).

41. *Id.* at 282.

42. *Id.* at 283–84 (citation omitted).

43. *Id.*

State to the sentencing process. Florida law provides for fourteen specific aggravating factors and does not allow consideration of any non-statutory aggravating factors.[44] The Florida Supreme Court has consistently held that presenting evidence of a defendant's lack of remorse as an aggravating factor is reversible error,[45] although logically it can sometimes be a substantial aggravating factor. A defendant's criminal record also cannot be considered in Florida by a judge or jury in determining sentence, other than a prior conviction for which the defendant is under sentence or a prior conviction of a felony involving violence to a person.[46] This Court can think of nothing more relevant to the determination of an appropriate sentence than criminal history, and Delaware courts regularly take it into consideration.

On the mitigating side of the ledger, Florida law enumerates eight specific mitigating factors, although one of them is a catch-all for anything else in the defendant's background.[47] While Florida law does not allow consideration of a defendant's full criminal history in aggravation, it correctly specifies the lack of a criminal record as a mitigating factor.[48]

In Delaware, the judge and jury are not so limited. Once a statutory aggravating factor has been established here, both judge and jury are charged with:

> weighing *all* relevant evidence in aggravation or mitigation which bears upon the particular circumstances or details of the commission of the offense and the character and propensities of the offender.[49]

The Delaware sentencing authority is thus directed to consider capital sentencing based on a balancing of the totality of all aggravating and mitigating circumstances, and is not encumbered by a statutory laundry list. From the time of its first consideration of the statute, the Supreme Court of Delaware has recognized that the weighing process is in fact a totality of circumstances analysis.[50]

■ The question this Court must address, which constitutes an amalgam of Delaware and Florida law, is whether under the totality of the circumstances there is any "reasonable basis in the record to support the jury's recommendation." The Court takes the key word to be "reasonable." It is a word that populates the legal lexicon like dandelions on a spring lawn. In the important context of this case it is worth stating the definition of "reasonable" from Webster's Third New International Dictionary:

> [R]easonable: being in agreement with right thinking or right judgment: not conflicting with reason: not absurd: not ridiculous.[51]

With that definition in mind the Court embarks on a reconsideration of the sentencing of Sadiki J. Garden.

---

44. Fla. Stat. Ann. § 921.141(5) (West 2002).

45. *See, e.g., Colina v. State,* 570 So.2d 929, 933 (Fla.1990) (citations omitted).

46. Fla. Stat. Ann. § 921.141(5)(a) and (b).

47. *Id.* at § (6).

48. *Id.* at § 6(a).

49. Del.Code Ann. tit. 11, § 4209 (emphasis added).

50. *State v. Cohen,* 604 A.2d at 849 (stating that "[w]e cannot conceive of a relevant factor in a totality of the circumstances analysis which would not also be weighed as a mitigating or aggravating factor under the new law. Thus, any distinct totality of the circumstances would be redundant.").

51. Webster's Third New International Dictionary of the English Language Unabridged 1892 (1993) (emphasis in the original).

■ A determination of whether any reasonable basis exists for the recommendation of the majority of the jury that aggravating factors do not outweigh mitigating factors requires a reassessment of those factors. The Court reiterates here that an aggravating factor justifies the imposition of the death penalty while a mitigating factor militates against the death penalty. All such factors must be proved at least by a preponderance of the evidence.

First, the aggravating factors. Denise Rhudy was killed during the course of an attempted robbery. This aggravating factor was established beyond a reasonable doubt by the verdict of the jury. In this case it is an aggravating factor of the highest magnitude. Denise Rhudy was not accosted during the course of an unlawful transaction or for the purpose of taking contraband from her. She was an innocent, law-abiding citizen who was out for a night of amusement with friends when she was gunned down because she refused to give up her property to an armed robber. The judgment of the people of this State that a crime of this nature justifies imposition of the ultimate penalty cannot reasonably be disputed.

After killing Rhudy, Garden took a shot at one of her companions, Stephanie Krueck. The bullet narrowly missed its target, passing instead through the sleeve of Krueck's jacket. The jury found Garden not guilty of attempting to murder Krueck, presumably because it had a reasonable doubt that he intended to kill her. However, the burden of proof for non-statutory aggravating circumstances is by a preponderance of the evidence, and the Court finds that Garden probably did intend to kill Krueck. But most importantly, the shot fired at Krueck shows Gar-

den's willingness to take a second life. This too is an aggravating factor of the highest order.[52]

The defendant's criminal record and habitual offender status are also aggravating factors of great magnitude. By age 24, Garden was eligible for a life sentence under one branch of Delaware's habitual criminal statute. Under Del.Code Ann. tit. 11, § 4214(a), if Sadiki Garden had fled after attempting to rob Denise Rhudy instead of killing her, he would have faced a sentence of twenty years to life. The Delaware habitual offender law reflects a strong public policy against releasing repeat offenders because of the threat they pose to society. When a three-time felon commits a fourth felony, the potential punishment is life in prison. When the fourth felony is first degree murder, the offender's eligibility for the death penalty should be manifest. Garden's status as a habitual offender is a non-statutory aggravating factor, which is firmly rooted in the public policy and law of this State. It is also a weighty aggravating circumstance.

The nature of Garden's crimes is equally important. All of his crimes involved some degree of premeditation, and all but two involved serious elements of violence and danger to the public. On two separate occasions, Garden was caught driving vehicles which he had stolen using burglary tools, indicating that he had planned to steal them. These were not impulse thefts occasioned by someone leaving keys in the car. In each instance, Garden led police on a high-speed chase through residential streets, exposing members of the public to injury. Each chase ended in a crash with Garden struggling against police officers as they attempted to arrest him.

---

**52.** *See* Del.Code Ann., tit. 11 § 4209(e)(i)k, which specifies the killing of two or more persons as a statutory aggravating circumstance.

The third receiving stolen property conviction is also significant. Garden was a passenger in a stolen vehicle occupied by three other individuals. When police approached the vehicle while it was stopped at a gas station, all occupants attempted to flee. Two were apprehended at the scene after a struggle. Both were armed. Garden and the fourth person escaped but were captured the next day. Garden told police that the other three occupants of the vehicle were on their way to attack a rival gang with guns, but that he was unarmed and would have been dropped off before the fight. Before his arrest, police searched Garden's apartment and seized two loaded guns. Here, too, the facts strongly indicate that Garden intended to engage in criminal conduct and that the ultimate purpose of the enterprise was violence.

The Court must note the events of the evening before the Rhudy murder. On that night, Garden and co-defendant Christopher Johnson were together in Garden's apartment. Garden needed money to purchase a car, and his solution was robbery. The two men walked around downtown Wilmington until they spotted two victims whom they robbed at gunpoint. They got cash and credit cards which they used later that night to purchase merchandise. As a result, Garden was convicted of two counts of robbery first degree in the same trial in which he was convicted of first degree murder. In addition to conviction on these crimes of violence, Garden has other convictions on forgery second degree, a felony, unlawful use of a credit card and resisting arrest.

The Delaware statute requires the Court and jury to consider the character and propensities of the offender. The only reasonable conclusion that can be drawn from Garden's criminal history, amassed by the age of 24, is that Garden has a serious propensity for violent criminal conduct. The Court finds no reasonable basis for deeming this criminal record as other than a substantial aggravating factor.

Consistent with Garden's propensity for lawlessness, is his inability to conform to prison rules. While most of his rule violations have been minor, three were for fighting and one for carrying an open razor. These facts show Garden's unwillingness to obey authority, which can only be taken as an aggravating factor.

Sadiki Garden has shown no remorse for killing Denise Rhudy. The Court finds this to be evidence of a cold and pitiless character. No reasonable person could consider Garden's lack of remorse as other than an aggravating factor.

Finally, the Court notes that Denise Rhudy was a wholly innocent victim selected at random. She was a good, decent and much-loved person who is missed by her family and friends. The Court sees no reasonable basis for finding that the loss of such a person is not an aggravating factor.

The Court has reviewed the aggravating factors to determine whether a juror could reasonably conclude that they were of little weight. The Court cannot do so. Any exercise of reason demands that heavy weight be accorded to the facts that the murder of Denise Rhudy was committed during an attempted robbery, that Garden aimed and fired at Stephanie Krueck and that he is a habitual criminal offender. The laws and policy of this State demand nothing less. Garden's pervasive and persistent criminal behavior, standing alone, is an aggravating factor of high magnitude, which cannot reasonably be downplayed. His lack of remorse and poor prison record are of somewhat less significance, but they confirm his malignant character and lawless propensity. Denise Rhudy's good character and place in her family and community are also factors which aggravate

Garden's crime. The Court finds that both law and reason dictate that these aggravating factors, taken together, be given great weight.

Next, the mitigating factors. In supplemental briefing on remand, the defense suggests several mitigating factors as providing a reasonable basis for the jury's recommendation. First, Garden asserts that his work history is a mitigating factor. The record provides facts on this subject only from June 1998 to the date of his arrest in December 1999. From June 1998 to July 1999, Garden was employed by a temporary agency and worked on assignment to various employers. Although the office manager described him as dependable, the agency's records show that Garden worked intermittently for only about four months during the thirteen-month period. In August 1999, Garden began working for a warehouse company, initially on assignment through a different temporary agency and then as a direct employee. A manager described him as a "good worker," but company records show that during his fourteen weeks of work Garden was late 23 times and was reprimanded for insubordination. The Court finds no reasonable basis to conclude that Garden's work history is other than a minor mitigating factor.

Garden was 24 years old when he killed Denise Rhudy, and he asserts that this is a mitigating factor. In its original sentencing opinion, the Court declined to find age a mitigating factor, writing that at age 24, "any person should appreciate the value of life."[53] The Court continues to hold that opinion, and even if a juror found some mitigating value in Garden's age, it is not reasonable to conclude that this factor could have been given substantial weight.

Next, Garden contends that his relationship with his girlfriend was a substantial mitigating factor. Garden became involved with Constance Webster in September 1997 and moved into her apartment in December. He moved out in April 1999 at her suggestion, but the relationship continued. Webster had four children when she began dating Garden and testified that he was a father figure to them and took care of them while she was working. She said he provided substantial financial support. However, the record casts some doubt on Webster's testimony. For example, Garden's work history hardly suggests that he could have made any substantial financial contribution to the household. The record also shows that Garden gave Webster items purchased with the credit cards stolen in the robbery the night before Rhudy's murder. It is extremely doubtful that this relationship could have been considered a mitigating circumstance of substantial weight.

Garden's psychological makeup is a factor requiring consideration. At the age of 23 months he was afflicted with a serious and life-threatening illness, Histiocytosis–X. This illness required several months of hospitalization followed by a lengthy period of chemotherapy. It was resolved by the time Garden was six or eight, but periodic follow-up examinations were necessary as a precaution against recurrence.

Garden's family testified that his illness caused them to spoil him and not impose necessary discipline on him, factors which may have contributed to his learning and discipline problems in school. Family members also noted that Garden lacked a father figure at home.

This history was used as the basis for opinions offered by Dr. Charles Bean, a neurologist with special competence in

---

**53.** *State v. Garden,* 792 A.2d at 1035.

children, and Dr. Alvin Turner, a licensed psychologist. Dr. Bean saw Garden on two occasions, at a medical examination when Garden was eleven and again in August of 2000 while he was in prison awaiting trial. Dr. Bean testified that Garden was in good health and showed no aftereffects of his childhood disease. He also testified that Garden had a performance IQ of 100, which is average, and a verbal IQ of 91, which is only slightly below average. Based on Garden's medical and social history, Dr. Bean concluded:

> Childhood experiences have shaped a gentleman with a personality of significant weakness and vulnerability, and he uses significant denial to protect himself from self realization.

Dr. Turner saw Garden on two occasions, once shortly after his arrest and once again shortly before trial. Dr. Turner, who conducted various psychological tests in addition to his clinical interviews, concluded that "Garden is best classified as a person with a personality disorder not otherwise specified." He went on to say:

> [I]t is my belief that his childhood experiences are crucially involved in shaping a life-long pattern of behavior which are [sic] responsible for the characteristics which I have outlined above. These include utter helplessness, a pervasive sense of guilt, and a deep and pervasive sense of personal incompetence.

The psychological makeup of a defendant is always an important factor in deciding a sentence in a capital case. On two previous occasions, this Court has overridden a death recommendation based on persuasive evidence that the defendant was not fully culpable for his actions. In *State*

*v. Jones,*[54] the Court found that the defendant suffered from a mental disorder that caused sporadic hallucinations and paranoid fantasies and that the disorder was a contributing factor to his crime. In *State v. Govan,*[55] the Court found that the defendant's borderline mental retardation prevented him from fully appreciating the wrongfulness of his conduct.

In this case no such considerations exist. Neither expert witness testified that Garden's mental state impinged on his ability to recognize the wrongfulness of murder or to resist the urge to commit the crime. In fact, certain testimony of Dr. Turner suggests that Garden acted with a cruel and brutal rationality:

> THE COURT: What might Mr. Garden have had to fear when he confronted Ms. Rhudy?
>
> DR. TURNER: His life falling apart. So the intensity of *fear of being caught* and his life coming apart could have triggered an impulsive reaction. (Emphasis added.)

The psychological evidence does not provide a rational basis for concluding that Garden's mental status was a mitigating factor. Any such conclusion reached by a juror would not be reasonable.

Finally, the defense suggests that Garden was substantially influenced by co-defendant Christopher Johnson to commit the crime. Substantial domination by another participant is a mitigating factor.[56] However, the record provides no evidence to support this assertion. In fact, the evidence is that the robbery leading up to Rhudy's murder was Garden's idea. This argument is further weakened by the fact

---

54. Del.Super., Cr. A. Nos. IN98080216 and – 217, Babiarz, J. (Capital Sentencing Decision) (May 17, 2000).

55. Del.Super., Cr. A. Nos. IN92101586–96, Babiarz, J. (Capital Sentencing Decision) (Sept. 7, 1993).

56. *Id.* at 26.

that Garden took a shot at Johnson when they argued at a party they attended after the murder.

The defense also argues that Johnson's being allowed to plead guilty to non-capital murder is a mitigating circumstance. The Court allowed this argument to be made to the jury but discounted it as a mitigating factor in its sentencing decision because murder was not part of the plan of robbery and Johnson did not fire the fatal shots. However, the Court now has second thoughts about that procedure. The portion of the sentencing statute governing the trial court provides that the Court and jury consider only "the particular circumstances or details of the commission of the offense and the character and propensities of the offender."[57] The penalty incurred by a co-defendant fits into neither of these categories. It does fit into the proportionality review that is required of the Supreme Court by the statute; namely, whether the death penalty was "disproportionate to the penalty recommended or imposed in similar cases."[58] The Court

believes that this is an issue properly reviewed *de novo* by the Supreme Court.

## CONCLUSION

As ultimately framed, the question before the Court is an amalgamation of the Florida law of *Tedder* and *Keen* and the Delaware capital sentencing statute; namely whether there is a reasonable basis in the record to support the conclusion that aggravating factors do not outweigh mitigating factors. The Court's conclusion is that there is not. The aggravating factors in this case are substantial and are supported not only by logic and common sense but by the public policy of this State. The mitigating factors are ephemeral in comparison. The Court will re-impose a sentence of death.

***IT IS SO ORDERED.***

---

57.  Del.Code Ann. tit. 11, § 4209(c) and (d).

58.  *Id.* at (g)(2)a.