Sadiki GARDEN, Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

Nos. 252,2003, 292,2003.

Supreme Court of Delaware.

Submitted: Nov. 4, 2003.

Decided: Feb. 13, 2004.

Bernard J. O'Donnell (argued), Brian J. Bartley, Timothy J. Weiler, and Nicole M. Walker, Office of the Public Defender, Wilmington, for Appellant.

Timothy J. Donovan, Jr. (argued), Thomas E. Brown, and Elizabeth R. McFarlan, Department of Justice, Wilmington, for Appellee.

Before VEASEY, Chief Justice, HOLLAND, BERGER, STEELE and JACOBS, Justices, constituting the Court en Banc.

PER CURIAM:

In this appeal, we review the trial court's decision to sentence Sadiki Garden to death. In an earlier opinion, this Court affirmed Garden's convictions, but held

that the trial court did not give the jury's recommendation of a life sentence appropriate weight.[1] This Court instructed the trial court, on remand, to give the jury's recommendation "great weight,"[2] and to override that recommendation "only if the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ."[3] On remand, the trial court carefully reviewed the record, and again concluded that the aggravating factors far outweighed the mitigating factors. This Court agrees that the record supports the trial court's analysis. The standard, however, is not whether the trial court's decision is supportable; it is whether the jury's opposite conclusion is supportable. Since the record is not so clear and convincing that no reasonable person could have voted for a life sentence, we must reverse.

Factual and Procedural Background

The facts surrounding the attempted robberies and murder of Denise Rhudy are detailed in *Garden v. State,*[4] and will only be summarized here. In December 1999, Garden and his two codefendants, Christopher Johnson and James Hollis, were driving around looking for someone to rob. Garden and Johnson had robbed a couple the night before in a parking lot near Garden's apartment, so the three men returned to the same area. Hollis waited in the car, while Johnson and Garden looked for victims. They spotted three people who had just parked their car—Rhudy, Stephanie Krueck and John Weilbacher. Krueck and Weilbacher had gotten out of their car when Garden approached, pointed a gun at them, and demanded money.

Both responded that they did not have any money. Garden then confronted Rhudy, who was still sitting in the car. After she, too, said she had no money, Garden shot her twice. He also fired one shot at Krueck before fleeing. Rhudy died at the scene. Krueck was not injured. The three men went to a party after their crime spree. They were apprehended three days later.

Hollis and Johnson testified against Garden as part of their plea bargains. Garden was convicted of one count of intentional murder, one count of felony murder, and various robbery and weapons charges. In the penalty phase, the jury voted 10–2 in favor of life imprisonment for the intentional murder count, and 9–3 in favor of life for the felony murder count. Nonetheless, the trial court imposed the death penalty, both after trial and after remand.

Discussion

a. The Florida Connection

In our earlier opinion, this Court noted that Delaware's 1991 death penalty statute was modeled after Florida's law, which had been upheld by the United States Supreme Court. Given this "legislative linkage," the Court determined that Florida's death penalty jurisprudence should be followed in deciding when a judge may override the jury's recommendation of a life sentence. Specifically, this Court applied the standard announced by the Florida Supreme Court in *Tedder v. State,*[5] holding that a jury override is permissible only if the facts supporting a death sentence are "so

---

1. *Garden v. State,* 815 A.2d 327 (Del.2003).

2. Indeed, the trial court had instructed the jury in the penalty phase that its recommendation would be given "great weight." *State v. Garden,* 792 A.2d 1025, 1030 (Del.Super.2001).

3. 815 A.2d at 343.

4. 815 A.2d 327.

5. 322 So.2d 908, 910 (Fla.1975).

clear and convincing that virtually no reasonable person could differ."

The trial court took exception to this ruling, noting that the 2002 amendment to Delaware's death penalty statute [6] clearly demonstrates the General Assembly's intention to vest primary sentencing responsibility with the judge, not the jury. The trial court also protested our reliance on Florida law, arguing that the *Tedder* standard is inconsistent with Delaware's public policy, as expressed by our legislature.[7] We respect the trial court's views, and the General Assembly's power to set public policy. But Garden's sentence is controlled by the 1991 statute, not the 2002 amendment, or a 2003 amendment directed specifically at the weight to be given to the jury's recommended sentence.[8]

The Synopsis to the 1991 statute expressly states that Delaware's law was modeled after the Florida death penalty statute, as approved by the United States Supreme Court.[9] In *State v. Cohen*,[10] in response to certified questions regarding the constitutionality of the 1991 statute, this Court noted that the 1991 statute was patterned after Florida law. Moreover, this Court, in upholding the Delaware statute, relied on the fact that the United States Supreme Court had found Florida's statute constitutional.[11] The United States Supreme Court decision, *Proffitt v. Florida*,[12] in turn, noted the *Tedder* standard in upholding the Florida statute [13]. Thus,

Florida death penalty jurisprudence, in general, and the *Tedder* standard, in particular, have been recognized as the underpinning for the 1991 statute from the time the law was enacted.

The majority and the dissent are in complete agreement that the 1991 Delaware death penalty statute implicates the *Tedder* standard imported from the Florida law upon which the Delaware statute was then based. The issue that we review, and on which the majority and the dissent part company, is how that standard should be applied to the facts of this case.

b. The Jury Override Standard.

Both the jury and the judge participate in a capital sentencing decision. Each is instructed to review the aggravating and mitigating factors, to evaluate their relative importance, and to decide whether the aggravating factors outweigh the mitigating factors. The judge must give the jury's determination "great weight," but the judge may override the jury's recommendation in appropriate cases. Where the jury recommends death, the trial judge may reject that recommendation and impose a life sentence.[14] Where the jury recommends a life sentence, however, the override threshold is extremely high. Under the *Tedder* standard, as interpreted numerous times by the Florida Supreme Court:

---

**6.** 73 Del. Laws Ch. 423 (2001).

**7.** *State v. Garden*, 831 A.2d 352, 356–357 (Del.Super.2003).

**8.** House Bill No. 287, 74 Del. Laws Ch. 174.

**9.** 68 Del. Laws Ch. 181.

**10.** 604 A.2d 846 (Del.1992).

**11.** 604 A.2d at 851.

**12.** 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

**13.** The United States Supreme Court relied on the "crucial protection" afforded by the *Tedder* standard again in *Dobbert v. Florida*, 432 U.S. 282, 295, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977), in deciding whether the Florida death penalty statute was an *ex post facto* law.

**14.** *Lawrie v. State*, 643 A.2d 1336, 1346 (Del. 1994).

[W]hen there is a reasonable basis in the record to support a jury's recommendation of life, an override is improper.... When there are valid mitigating factors discernible from the record upon which the jury could have based its recommendation an override may not be warranted.[15]

Florida cases in which overrides were upheld involved especially cruel and heinous murders by defendants who presented no mitigating circumstances or only very marginal ones.[16]

■■■ Thus, we start with the unarguable proposition that the trial judge may override the jury's recommendation of life without parole *only if the facts supporting the death sentence are so clear and con-*vincing *that no reasonable person could differ.* The Delaware death penalty procedure requires a record of the exact vote of the jury and that the advice will be given "great weight"[17] because it is the "conscience of the community."[18]

If the jury verdict is to be cast aside simply because the trial judge disagrees with it, one wonders about the purpose and value of the jury's advisory verdict. Nevertheless, the Delaware General Assembly, in its 2003 amendment to the death penalty statute, elected to vest discretion in the trial judge to give the jury's recommendation "such consideration as deemed appropriate."[19] The State does not contend on this appeal, however, that the 2003 statute applies to Garden.[20]

---

**15.** *Ferry v. State,* 507 So.2d 1373, 1376 (Fla. 1987).

**16.** In one such case, for example, defendant and his accomplice spotted a teen-aged couple parked in a car near the beach. After being forced at gunpoint to a secluded area, the accomplice guarded the boy while the defendant raped the girl. The boy attempted to help his girlfriend, but was shot four times in the head. The accomplice then took his turn raping the girl vaginally and anally. When the accomplice was done, he shot her twice in the head. Then defendant raped her anally, rolled her over, and shot her in the forehead. The only mitigating factors were that defendant was 22 years old and had no significant criminal history. *Hoy v. State,* 353 So.2d 826 (Fla.), *cert. denied,* 439 U.S. 920, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978); See, also: *Douglas v. State,* 328 So.2d 18 (Fla.), *cert. denied,* 429 U.S. 871, 97 S.Ct. 185, 50 L.Ed.2d 151 (1976).

**17.** *See, e.g., Capano v. State,* 781 A.2d 556, 656 n. 417 (Del.2001).

**18.** *See, e.g., State v. Cohen,* 604 A.2d 846, 856 (Del.1992).

**19.** The 2003 statute (House Bill No. 287) provides:

The jury's recommendation concerning whether the aggravating circumstances found to exist outweigh the mitigating circumstances found to exist shall be given such consideration as deemed appropriate by the Court in light of the particular circumstances or details of the commission of the offense and the character and propensities of the offender as found to exist by the Court. The jury's recommendation shall not be binding upon the Court.

**20.** Interestingly, however, the statute purports to apply not only prospectively but also to "all defendants tried, re-tried, sentenced or resentenced after its effective date." In the Opinion of the Justices, furnished to Governor Minner on July 11, 2003, in response to her inquiry as to the constitutionality of House Bill No. 287, we said:

First, in our opinion, none of the provisions of House Bill No. 287 is unconstitutional on its face, at least to the extent that they operate prospectively to defendants whose crimes are committed after the statute is enacted. Second, whether or not any of the provisions set forth in Sections 1, 2 or 4 may be deemed to have been unconstitutionally applied retrospectively or sought to be applied to a particular defendant in a particular case may be determined only on a case-by-case basis.

(Footnote omitted).

Here, we are required to apply not the 2003 statute, but the 1991 statute, which we have construed as incorporating the *Tedder* standard.[21] If *reasonable* minds can differ in weighing the aggravating and mitigating factors, it necessarily follows that the trial judge may not override the jury's verdict because, by definition, it cannot be said that no *reasonable* juror could have determined to recommend a sentence of life without parole, rather than death.

In its decision after remand, the trial court reevaluated the reasonableness of its own decision and concluded, with justification, that there is record support for the imposition of a death sentence. But the *Tedder* standard is not directed at the trial court's reasoning. Rather, it requires that the court evaluate the jury's decision and determine whether there is any evidence to sustain the jury's conclusion.[22] When the facts are analyzed from this perspective, the jury's recommendation to spare Garden's life must be upheld.

c. The *Tedder* Standard Applied to Garden.

■ One cannot overlook the overwhelming vote of the jury. Ten of the twelve jurors recommended life without parole. Those ten jurors could have based their decision on the following facts: 1) the shooting was not planned; 2) Garden suffered a life-threatening childhood illness that negatively affected his development and resulted in a personality disorder; 3) Garden had a decent work history; 4) Garden had a positive relationship with his girlfriend and her children; and 5) Garden's accomplice was given a plea bargain and received a life sentence. The issue is not whether the trial court or this Court

would independently have been persuaded that these factors outweigh the aggravating factors. Rather, the trial court should have reviewed the record to determine whether there is support for these mitigating factors and, if so, whether they could reasonably form the basis for a recommendation of life.

1) Lack of Planning.

■ Both of Garden's original co-defendants, who testified against Garden, testified that there was no prior plan to shoot or kill anyone. The absence of premeditated intent is a relevant mitigating factor.[23]

2) Garden's Psychological Deficiencies.

Dr. Charles Bean, a neurologist, testified that Garden was diagnosed with a potentially fatal disease as a child and was treated for that disease from age 2–8. Because of the prolonged treatment and the seriousness of the illness, Bean opined that Garden was never taught appropriate boundaries and behavioral expectations. Bean concluded that the disease and the lack of parental control added significantly to Garden's inability to accept responsibility for his acts.

Dr. Alvin L. Turner, a clinical psychologist, also testified about Garden's personality. Turner explained that, although Garden exhibits anti-social behaviors, he is not a sociopath or predator. Turner testified that Garden functions out of fear; that he behaves much like a child, who acts impulsively without thinking; that he is capable of empathy and remorse; and that Garden would be able to acclimate himself to prison life.

**21.** *See Pennell v. State,* 604 A.2d 1368, 1377 (Del.1992).

**22.** *Ferry v. State,* 507 So.2d at 1377.

**23.** See: *Ferguson v. State,* 642 A.2d 772, 787 (Del.1994).

### 3) Garden's Employment.

Garden had been employed for 1½ years prior to his arrest. He started working through a temporary agency. The manager of that agency described Garden as a "dependable worker" who showed up when scheduled. One of Garden's jobs was at a warehouse company. The manager of that company thought Garden was a good employee—so good, in fact, that he hired Garden for a permanent job. The manager acknowledged that Garden had been insubordinate on one occasion, but testified that the incident was minor and that, after talking to Garden about it, there were no further problems.

### 4) Garden's Relationship With His Girlfriend.

Garden's girlfriend testified that he provided emotional and financial support to her and her children during their two-year relationship. She said that her three-year-old child was especially attached to Garden and that they continue to visit him regularly in prison. She explained that Garden used to take care of her children while she worked and took them to activities, in addition to providing financial support.

### 5) Disparate Treatment of Garden's Accomplice.

Johnson, who admitted that he recklessly caused Rhudy's death, was a "principal player" in the crime, which "probably would not have occurred without his participation."[24] Yet he received a life sentence under a plea agreement. The State argued that Garden is more culpable because he pulled the trigger, but our courts

(and Florida's) have long recognized a co-defendant's life sentence as a mitigating factor.[25]

The aggravating circumstances in this case are, without question, significant. Garden killed Rhudy during an attempted robbery; he has a history of committing violent crimes; he expressed no remorse; and he took the life of an innocent mother of four children. The trial court also considered Garden's prison record an aggravating factor, although the jury may not have agreed, given the fact that most of Garden's infractions involved disobeying orders by, for example, asking for an extra piece of chicken.[26]

■ The trial court and the jury reached different conclusions in their evaluation of the aggravating and mitigating circumstances. When that happens, the trial judge must accept the jury's recommendation if it has a reasonable basis in the evidence:

> Where a jury and a trial judge reach contrary conclusions because the facts derive from conflicting evidence, or where they have struck a different balance between aggravating and mitigating circumstances which both have been given an opportunity to evaluate, the jury recommendation should be followed because that body has been assigned by history and statute the responsibility to discern truth and mete out justice. Given that the imposition of a death penalty "is not a mere counting process of X number of aggravating circumstances and Y number of mitigating circumstances, but rather a reasoned judgment

---

**24.** *State v. Garden,* 792 A.2d 1025, 1035 (Del.Super.2001).

**25.** See, e.g. *State v. Ferguson,* 642 A.2d 1267, 1269 (Del.Super.1992); *State v. Cabrera,* 1999 WL 41630 (Del.Super.Jan.21, 1999); *Brookings v. State,* 495 So.2d 135, 144 (Fla.1986).

**26.** It appears that his most serious infraction was that a razor was found in his cell. But nothing in his prison records indicated that he was considered a risk to institutional safety.

. . .", both our Anglo–American jurisprudence and Florida's death penalty statute favor the judgment of jurors over that of jurists.[27]

Here, as in *Keen v. State*,[28]

the focus of the [trial judge's] analysis was not upon finding support for the jury's recommendation, *i.e.*, determining if a reasonable basis existed for the jury's decision, but rather toward proving that the jury got it wrong and lacked any reasonable basis to recommend life. In other words, the trial judge disagreed with their recommendation based on his view of the mix of aggravators and mitigators, rather than through the prism of a *Tedder* analysis.

To be sure, one can parse the issues where each of the aggravating and mitigating factors is weighed and make a cogent assessment that the former outweigh the latter. That is precisely the *argument* that is artfully made in the very thoughtful dissent. But in the end, it is just that—an excellent *argument*, skillfully maximizing the horrific nature of this murder and denigrating the defendant's character, while trivializing the mitigating factors in the record that would support the jury's verdict.

██ Indeed, the dissent demonstrates that the jury should have found that the aggravating factors outweigh the mitigating factors. Whether in our view they should have or not, the dissent fails to persuade us that the conclusion of this death-qualified[29] jury, which heard all the evidence, including live witnesses at the trial and the penalty hearing, was so irrational that its verdict cannot be given great weight, but instead is entitled to no respect whatsoever. That may be the effect of the 2003 statute on new cases to which it may be constitutionally applied after its effective date. But that is not the law under the 1991 statute, which applies to this case.

In sum, the trial court need not, and we need not, agree with the jury's conclusion in order to uphold it. We may strongly disagree. Under the governing law, however, the jury's recommendation must be respected if it is supported by the record and is not irrational. Proper application of the *Tedder* standard requires that the trial court's override be reversed and that Garden be sentenced to life in prison without the possibility of probation or parole.

### Conclusion

Based on the foregoing, the decision of the Superior Court imposing a death sentence is REVERSED and this matter is REMANDED for imposition of a sentence of life imprisonment without the possibility of probation and parole. Jurisdiction is not retained.

HOLLAND, Justice, dissenting.

Of the thirty-seven states that sanction capital punishment, Delaware and Florida are two of only four states that provide for a jury override.[30] The issue presented in Garden's case relates to the death penalty

---

**27.** *Chambers v. State*, 339 So.2d 204, 208 (Fla. 1976).

**28.** 775 So.2d 263, 284–285 (Fla.2000).

**29.** Under the 1991 statute, a jury empaneled to hear a capital case must be death qualified. *State v. Cohen*, 604 A.2d 846, 855–56 (Del. 1992). That requirement means "no juror was selected who was so conscientiously op-

posed to the death penalty as to preclude joining in a recommendation of death." *Garden v. State*, 815 A.2d 327, 344 (Del.2003).

**30.** Ala.Code § 13A–5–47(c) (1997); Del.Code Ann. tit. 11, § 4209(d) (2001); Fla. Stat. ch. 921.141 (2002); Ind.Code § 35–50–2–9 (1998 & Supp.2003).

statute that Delaware enacted in 1991, using the post-*Furman*[31] Florida statute as a model.[32] The operation of Florida's jury override was discussed by the United States Supreme Court briefly in 1976 in *Proffitt v. Florida*,[33] and at length in 1984 in *Spaziano v. Florida*.[34] When this Court upheld the constitutionality of the 1991 Delaware statute, we relied upon those holdings by the United States Supreme Court that had approved the Florida death penalty system.

In *Proffitt*, the United States Supreme Court discussed the Florida jury override and quoted from the Florida Supreme Court's decision in *Tedder v. State*. Pursuant to the holding in *Tedder*, the United States Supreme Court recognized that in order to sustain a judge's sentence of death by overriding a jury recommendation of life, Florida required the facts suggesting a sentence of death to be "so clear and convincing that virtually no reasonable person could differ." [35] The United States Supreme Court examined and upheld the facial constitutionality of the *Tedder* jury override standard in 1984 in *Spaziano v. Florida*.[36]

The *Tedder* holding is now well established as the cornerstone of the Florida jury override doctrine. The Florida Supreme Court has recognized that the *Tedder* standard is rigorous, and that it has become more so in the years since *Spaziano v. Florida* was decided. This Court cited *Tedder* in 1992 in the *Pennell* opinion that resulted in the first Delaware execution following the enactment of the new statute.[37]

### Florida Override Experience

Delaware adopted a death penalty statute in 1991 that was modeled on the Florida statute.[38] Accordingly, the summary of the Florida jury override system in a 1991 law review article by Michael Mello is didactic.[39] Table 1 that is attached to the Mello article shows that in the fifteen year span of Florida's post-*Furman* statute, jury life recommendation overrides by trial judges were reversed in seventy-four percent of the cases by the Florida Supreme Court.

The same article then states that the figures in Table 1 become more significant when they are divided into three time periods. "From 1974 (when the first override case reached the Florida Supreme Court) until the end of 1983 (just before *certiorari* review was granted in *Spaziano v. Florida*), sixteen of sixty-two life overrides were affirmed. In 1984 and 1985—during the pendency of *Spaziano v. Florida* in the United States Supreme Court and the year after *Spaziano* was decided—affirmances by the Florida court were significantly more frequent: twelve of eighteen (66.7%).

31. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

32. *State v. Cohen*, 604 A.2d 846 (Del.1992).

33. *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

34. *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).

35. *Proffitt v. Florida*,. 428, U.S. at 249, 96 S.Ct. 2960 (quoting *Tedder v. State*, 322 So.2d 908, 910 (Fla.1975)).

36. *Spaziano v. Florida*, 468 U.S. at 453, 104 S.Ct. 3154.

37. *Pennell v. State*, 604 A.2d 1368, 1377 (Del. 1992).

38. *Garden v. State*, 815 A.2d 327, 342 (Del. 2003).

39. Michael Mello, *The Jurisdiction to Do Justice: Florida's Jury Override and the State Constitution*, 18 Fla. St. U.L. Rev. 924, 937 (1991).

But from 1986 through May 1990, only two of thirty-two (6.25%) were affirmed." [40]

Therefore, in the four years that immediately preceded the enactment of the Delaware statute in 1991, death sentences imposed by jury overrides were reversed by the Florida Supreme Court in more than ninety-three percent of the relevant cases. Conversely, death sentences imposed by overrides of jury life recommendations survived appellate review in less than seven percent of the cases during that four-year period. According to a subsequent study, the Florida Supreme Court continues to affirm jury override death sentences in only a few cases.[41]

Garden is the first case, and may be the only case, in which this Court applies the *Tedder* standard to review a trial judge's decision to impose a death sentence by overriding a jury recommendation of life.[42] The Florida Supreme Court, however, has applied the *Tedder* standard in reviewing more than 140 jury override cases.[43] Since very few death sentences imposed by jury overrides have been affirmed by the Florida Supreme Court, it is logical for this Court to look at the facts in some of those Florida cases where the *Tedder* standard was applied and the judge's decision to impose death by overriding the jury's recommendation of life were affirmed.

### Florida Mills Jury Override

The *Mills* case from Florida is significant for two reasons. First, the facts of the crime and the circumstances of the defendant are similar to the Garden case. Second, the trial judge's jury override death sentence in *Mills* was not only affirmed on direct appeal in 1985, during the Florida Supreme Court's statistical zenith in affirming jury overrides, but the jury override death sentence in *Mills* was also reaffirmed in 2001, during the still extant nadir in the Florida Supreme Court's override affirmance rate.

In 1979, Mills, *then 22 years old*, was convicted of *felony murder*, aggravated battery, and burglary. The facts set forth by the Florida Supreme Court in its 1985 opinion on direct appeal are as follows:

> The evidence at the trial showed that Gregory Mills and his accomplice Vincent Ashley broke into the home of James and Margaret Wright in Sanford between two and three o'clock in the morning, *intending to find something to steal.* When James Wright woke up and left his bedroom to investigate, Mills *shot* him with a shotgun. Margaret Wright awakened in time to see one of the intruders run across her front yard to a bicycle lying under a tree. Mr. Wright died from loss of blood caused

**40.** *Id.* At 937. *See also Cochran v. State,* 547 So.2d 928, 933 (Fla.1989).

**41.** Ken Driggs, *Regulating the Five Steps to Death: A Study of Death Penalty Direct Appeals in the Florida Supreme Court 1991–2000,* 14 St. Thomas L. Rev. 759, 770 (2002).

**42.** In 2003, the Delaware death penalty statute was amended and the *Tedder* standard for appellate review of jury override death sentences was eliminated. Therefore, Garden's case may be the only opinion in which the Delaware Supreme Court applies the *Tedder* standard to review a jury override death sen-

tence. The *Tedder* standard for jury overrides is still the law in Florida. A similar proposal to remove the *Tedder* standard by amending the Florida statute was vetoed several years ago. *See* LaTeur Rey Lafferty, *Florida's Capital Sentencing Jury Override: Whom Should We Trust to Make the Ultimate Ethical Judgment,* 23 Fla. St. U.L. Rev. 463, 483–84 (1995).

**43.** *See* Scott E. Erlich, Comment, *The Jury Override: A Blend of Politics and Death,* 45 Am. U.L. Rev. 1403, 1405 (1996).

by multiple shotgun pellet wounds.[44]

After finding Mills guilty of first degree murder, burglary, and aggravated battery, and with the knowledge that the prosecution granted *immunity to Mills' co-defendant,* Ashley, who testified against Mills, the jury recommended a sentence of life imprisonment.

The Florida Supreme Court affirmed the trial judge's jury override and specifically held that the jury override death sentence in Mills' case met the requirements of *Tedder v. State.*[45]

> We hold that the trial judge's findings in support of the sentence of death even without the finding of especially heinous, atrocious and cruel, meet the *Tedder* standard. We find that the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ. There are three valid statutory aggravating circumstances, and the trial judge has found there are no valid mitigating circumstances. The purported mitigating circumstances claimed by Mills, but not found by the trial judge, are not sufficient to outweigh the aggravating circumstances nor do they establish a reasonable basis for the jury's recommendation. We conclude that the imposition of a sentence of death after a jury recommendation of life was proper in this case.[46]

In 2001, the Florida Supreme Court had the *Mills* jury override death sentence before it once again. According to Mills' collateral attack on his jury override death sentence, *Keen's*[47] application of *Tedder* by the Florida Supreme Court constituted a new standard by which jury override cases are reviewed in Florida. In responding to Mills' argument, the Florida Supreme Court acknowledged:

> In *Keen,* on the defendant's direct appeal following his third trial, we applied the *Tedder* analysis. In applying *Tedder,* we emphasized the fact that a trial court's analysis in an override situation should focus on the record evidence supporting the jury's recommendation and should not be the same weighing process that is used when the jury recommends death.[48]

The Florida Supreme Court then made three emphatic points in its 2001 *Mills* opinion. First, *Keen* is not a major constitutional change or jurisprudential upheaval of the law as it was espoused in *Tedder.*[49] Second, *Keen* offers no new or different standard for considering jury overrides on appeal.[50] Third, "we disagree with Mills' contention that *Keen* offers a new standard of law and we reject the contention that *Keen* was anything more than an application of our long-standing *Tedder* analysis."[51]

The final three statements in the 2001 *Mills* opinion, however, are most significant in our review of Garden's appeal. First, *Tedder* is the seminal case in Florida

---

44. *Mills v. State,* 476 So.2d 172, 174 (Fla. 1985) (emphasis added).

45. *Tedder v. State,* 322 So.2d 908, 910 (Fla. 1975) ("a jury's recommendation of life should be given great weight and should be followed unless the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ.").

46. *Mills v. State,* 476 So.2d at 179.

47. *Keen v. State,* 775 So.2d 263 (Fla.2000).

48. *Mills v. Moore,* 786 So.2d 532, 539 (Fla. 2001).

49. *Id.* at 540

50. *Id.*

51. *Id.*

on jury overrides and remains so after *Keen*.[52] Second, *Tedder* was properly applied to the *Mills* case.[53] Third, *Keen* provides no basis for a reconsideration of the trial judge's decision to sentence Mills to death by overriding the jury's recommendation for life.[54]

### Garden Jury Recommendation

Garden was convicted on three counts of Murder in the First Degree, Robbery in the First Degree, Possession of a Deadly Weapon During the Commission of a Felony and related charges.[55] The jury's unanimous finding, under a reasonable doubt standard, that Garden committed felony murder established the statutory aggravating circumstance rendering Garden eligible for the death sentence.[56] The jury then recommended a finding that the aggravating circumstances did not outweigh the mitigating circumstances by a ten to two vote on the intentional murder conviction and by a vote of nine to three on the merged felony murder conviction.[57] The Superior Court was required to apply the *Tedder* standard by giving the jury's advisory recommendation of a life sentence "great weight" and the Superior Court could override the jury's majority recommendation only "if the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ." [58]

### Garden's Aggravating Circumstances

The Superior Court determined that several aggravating circumstances were associated with the murder of Denise Rhudy by Garden:

1) **Statutory Aggravator—Felony Murder**—The fact that Denise Rhudy was killed during the commission of an attempted robbery established the statutory aggravating circumstance of felony murder that rendered Garden eligible for the death sentence.[59] This aggravating factor was established beyond a reasonable doubt by the verdict of the jury. The Superior Court judge described this felony murder as an aggravating factor of the highest magnitude because "Denise Rhudy was not accosted during the course of an unlawful transaction or for the purpose of taking contraband from her. She was an innocent, law-abiding citizen who was out for a night of amusement with friends when she was gunned down because she refused to give up her property to an armed robber. The judgment of the people of this State that a crime of this nature justifies imposition of the ultimate penalty cannot reasonably be disputed."

2) **Attempted Murder of Companion**—After killing Denise Rhudy, Garden fired a shot at one of her companions, Stephanie Krueck. The bullet narrowly missed its target, passing instead through the sleeve of Krueck's jacket. The Superior Court judge found that Garden probably did intend to kill Krueck. But most importantly to the Superior Court judge, "the shot fired at Krueck shows Garden's willingness

---

52. *Id.*

53. *Id.*

54. *Id.*

55. *State v. Garden*, 792 A.2d 1025, 1027–28 (Del.Super.2001).

56. *Id.* at 1028 & n. 1 (citing Del.Code Ann. tit. 11, § 4209(e)(1)(j), (e)(2)).

57. *Id.* at 1028.

58. *Garden v. State*, 815 A.2d 327, 343 (Del. 2003).

59. *State v. Garden*, 792 A.2d 1025, 1028 & n. 1 (Del.Super.2001) (citing Del.Code Ann. tit. 11, § 4209(e)(1)(j), (e)(2)).

to take a second life." Accordingly, the judge stated "this too is an aggravating factor of the highest order."[60]

3) **Lack of Remorse**—The Superior Court judge found that Garden had shown no remorse for killing Denise Rhudy. The Court found this to be "evidence of a cold and pitiless character." The judge determined that no reasonable person could consider Garden's lack of remorse as other than an aggravating factor.

4) **Criminal Record**—Despite his relatively young age, Garden had amassed a significant criminal record. By age 24, Garden was eligible for a life sentence under Delaware's habitual criminal statute.[61] The judge noted that the Delaware habitual offender law reflects a strong public policy against releasing repeat offenders because of the threat they pose to society. The Superior Court judge concluded that "Garden's status as an habitual offender is a non-statutory aggravating factor, which is firmly rooted in the public policy and law of this State. It is also a weighty aggravating circumstance." The nature of Garden's prior crimes was equally important to the Superior Court judge. All of Garden's crimes involved some degree of premeditation, and all but two involved serious elements of violence and danger to the public. On two separate occasions, Garden was caught driving vehicles which he had stolen using burglary tools. In each instance, Garden led police on a high-speed chase through residential streets, exposing members of the public to injury. Each chase ended in a crash with Garden struggling against the police as they attempted to arrest him. Accordingly, the Superior Court judge determined that "Garden's criminal record and habitu-

al offender status are also aggravating factors of great magnitude."

5) **Character and Propensities**—The Delaware statute requires the judge and jury to consider the character and propensities of the offender. The judge determined "the only reasonable conclusion that can be drawn from Garden's criminal history amassed by the age of 24 is that Garden had a serious propensity for violent criminal conduct." The judge found no reasonable basis for deeming Garden's criminal record as other than a substantial aggravating factor.

An examination of the substance of the prior felony crimes committed by Garden revealed serious elements of violence and premeditated lawlessness. In fact, if he had only committed the armed robbery of Denise Rhudy, Garden was eligible for habitual criminal status. The Superior Court judge characterized Garden's criminal history as an aggravating circumstance of "great magnitude."

6) **Incorrigibility**—The Superior Court judge found that "consistent with Garden's propensity for lawlessness, is his inability to conform to prison rules." The judge determined that while most of Garden's rule violations in prison were minor, three were for fighting and one for carrying an open razor. The Superior Court judge concluded that "these facts show Garden's unwillingness to obey authority, which can only be taken as an aggravating factor."

7) **Victim Impact**—The Superior Court judge determined that another aggravating factor was the impact of Denise Rhudy's death on those around her, including her parents, with whom she was close; her best friend, who witnessed her murder;

**60.** *See* Del.Code Ann., tit. 11 § 4209(e)(1)(k), which specifies the killing of two or more persons as a statutory aggravating circumstance.

**61.** Del.Code Ann. tit. 11, § 4214(a).

her ex-husband, who is now a single parent of four young children; and most compelling, her four children, who were aged 16 months to 14 years at the time of her murder. The Superior Court judge noted that Denise Rhudy was a wholly innocent victim selected at random. She was described as a good, decent and much-loved person who is missed by her family and friends. The judge saw "no reasonable basis for finding that the loss of such a person is not an aggravating factor."

### Garden's Mitigating Circumstances

The Superior Court judge carefully considered the mitigating circumstances presented by Garden and determined that each of those claims of mitigation by Garden were entitled to little or no weight.

(1) **Planning**—Both of Garden's original co-defendants, who testified against Garden, stated there was no prior plan to shoot or kill anyone. Garden contends that the absence of premeditated intent to kill anyone is a mitigating factor. The jury convicted Garden of both Intentional Murder in the First Degree and Felony Murder in the First Degree. The record is undisputed that Garden armed himself with a loaded weapon and planned to rob an innocent victim at gun point simply because he wanted money that night. When a plan to commit armed robbery at gun point results in death, it becomes felony murder. Rather than a mitigating circumstance, the General Assembly has classified felony murder as the statutory circumstance that made Garden eligible for the death sentence.

(2) **Employment History**—Garden asserts that his work history is a mitigating factor. The record provides facts on this subject only from June 1998 to the date of his arrest in December 1999. From June 1998 to July 1999, Garden was employed by a temporary agency and worked on assignment to various employees. Although the office manager described him as dependable, the agency's records show that Garden worked intermittently for only about four months during the thirteen-month period. In August of 1999, Garden began working for a warehouse company, initially on assignment through a different temporary agency and then as a direct employee. A manager described him as a "good worker," but company records show that during his fourteen weeks of work, Garden was late 23 times and was reprimanded for insubordination. The Superior Court judge found no reasonable basis for the jury to conclude that Garden's work history was anything other than a minor mitigating factor. Moreover, Garden's ability to work aggravates his decision to support himself through a life of crime.

(3) **Relationship with Girlfriend**—Garden contended that his relationship with his girlfriend was a substantial mitigating factor. Garden became involved with Constance Webster in September 1997 and moved into her apartment in December. He moved out in April 1999 at her suggestion, but the relationship continued. Webster had four children when she began dating Garden and testified that he was a father figure to them and took care of them while she was working. She said he provided substantial financial support. The Superior Court judge determined that the record casts some doubt on Webster's testimony. For example, Garden's work history reflects that he could not have made any substantial financial contribution to the household. The record also demonstrates that Garden gave Webster items purchased with the credit cards stolen in the robbery the night before Denise Rhudy's murder. Accordingly, the Superior Court judge concluded that there was no reasonable basis for the jury to consider

this relationship a mitigating circumstance of substantial weight.

(4) **Age**—Garden was 24 years old when he murdered Denise Rhudy. Garden asserted that this age was a mitigating factor. The Superior Court judge concluded that, even if a juror found some mitigating value in Garden's age, it is not reasonable for the jury to conclude that this factor could have been given substantial weight.

(5) **Psychological Evidence**—Garden's psychological makeup is another factor that the Superior Court was asked to consider in mitigation. At the age of 23 months, Garden was afflicted with a serious and life-threatening illness, Histiocytosis–X. This illness required several months of hospitalization followed by a lengthy period of chemotherapy. It was resolved by the time Garden was age six or eight, but periodic follow-up examinations were necessary as a precaution against recurrence. This history was used as the basis for opinions offered by Dr. Charles Bean, a neurologist with special competence in children, and Dr. Alvin Turner, a licensed psychologist.

Dr. Bean saw Garden on two occasions, at a medical examination when Garden was eleven and in again August of 2000 while he was in prison awaiting trial. Dr. Bean testified that Garden was in good health and showed no after-effects of his childhood disease. He also testified that Garden had a performance IQ of 100, which is average, and a verbal IQ of 91, which is only slightly below average. Drawing on Garden's medical and social history, Dr. Bean concluded: "Childhood experiences have shaped a gentleman with a personality of significant weakness and vulnerability, and he used significant denial to protect himself from self realization."

Dr. Turner saw Garden on two occasions, once shortly after his arrest and once again shortly before trial. Dr. Turner, who conducted various psychological tests in addition to his clinical interviews, concluded that "Garden is best classified as a person with a personality disorder not otherwise specified." He went on to say: "It is my belief that his childhood experiences are crucially involved in shaping a life-long pattern of behavior which are responsible for the characteristics which I have outlined above. These include utter helplessness, a pervasive sense of guilt, and a deep and pervasive sense of personal incompetence."

Neither expert witness testified that Garden's mental state impinged on his ability to recognize the wrongfulness of murder or to resist the urge to commit the crime. Certain testimony of Dr. Turner suggests that Garden acted with a cruel and brutal rationality. In fact, after killing Denise Rhudy, Garden later callously told his co-defendants that he had "shot the bitch because she wouldn't give it up." [62] The Superior Court judge found that the psychological evidence did not provide a rational basis for concluding that Garden's mental status was a mitigating factor, and a contrary conclusion by a juror would have been unreasonable.

(6) **Disparate Treatment of Garden Accomplice**—Garden argued that another mitigating circumstance is the fact that his co-defendant, Johnson, was allowed to plead guilty to non-capital murder. Jury recommendations against the death penalty, which may have been based on a desire to provide equality in sentencing, were considered by the Florida Supreme Court in *Eutzy v. State*.[63] In that case, the

---

**62.** *State v. Garden*, 792 A.2d at 1033.

**63.** *Eutzy v. State*, 458 So.2d 755 (Fla.1984), cert. denied, 471 U.S. 1045, 105 S.Ct. 2062, 85 L.Ed.2d 336 (1985).

Florida Supreme Court acknowledged that it has upheld the reasonableness of jury recommendations of life which could have been based, to some degree, on the treatment accorded one equally culpable of the murder.[64] In summarizing its cases that had reversed the judge's decision to override the jury recommendation, the Florida Supreme Court found: the accomplice was a principal in the first degree;[65] the accomplice was the actual triggerman;[66] the evidence was equivocal as to whether defendant or the accomplice committed the actual murder;[67] or the accomplice was the controlling force instigating the murder.[68] In each of those Florida cases, the jury had before it, in either the guilt or the sentencing phase, direct evidence of the accomplice's equal culpability for the murder itself. The Superior Court judge concluded that the evidence in Garden's case provided no basis upon which the jury could have recommended life imprisonment in order to prevent disparity in sentencing. The record reflects that it was Garden, rather than his accomplices, who inflicted the fatal shot. In *Mills*, the Florida Supreme Court affirmed the jury override death sentence when the less culpable defendant was given immunity.

### Garden Jury Override Death Sentence

The record in this case supports the Superior Court judge's findings regarding the aggravating and mitigating circumstances. The judge concluded that the aggravating factors were substantial and that the mitigating factors were ephemeral in comparison. The Superior Court judge in Garden's case, like the judge in *Mills*,[69] concluded that the purported mitigating circumstances claimed by Garden were not sufficient to outweigh the aggravating circumstances and did not establish a reasonable basis for the jury's recommendation of a life sentence. Accordingly, the Superior Court judge concluded the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ. That conclusion by the Superior Court judge is supported by the record and is the product of a logical deductive process. The record reflects that Garden is a remorseless, incorrigible, violent habitual offender who committed an unprovoked cold-blooded murder of an innocent person who lacked the ability to defend herself, solely for pecuniary gain.

### Other Analogous Florida Override Cases

The jury override death sentence imposed in Garden's case is consistent with *Mills* and is consistent with jury override death sentences affirmed by the Florida Supreme Court in other similar cases. In *Echols v. State*,[70] the crime was felony murder. It occurred during the commission of a robbery and burglary in the home of the victim by a person previously convicted of violent felonies. Four aggravators were found.[71] In addition to the other

---

**64.** See McCampbell v. State, 421 So.2d 1072 (Fla.1982).

**65.** Herzog v. State, 439 So.2d 1372 (Fla.1983); McCampbell v. State, 421 So.2d 1072 (Fla. 1982).

**66.** Barfield v. State, 402 So.2d 377 (Fla.1981); Slater v. State, 316 So.2d 539 (Fla.1975).

**67.** Smith v. State, 403 So.2d 933 (Fla.1981); Malloy v. State, 382 So.2d 1190 (Fla.1979); Halliwell v. State, 323 So.2d 557 (Fla.1975).

**68.** Stokes v. State, 403 So.2d 377 (Fla.1981); Neary v. State, 384 So.2d 881 (Fla.1980).

**69.** Mills v. State, 476 So.2d 172, 177 (Fla. 1985).

**70.** Echols v. State, 484 So.2d 568 (Fla.1985).

**71.** Id. at 576.

factors, the trial judge found that, *like Garden*, the defendant failed to exhibit any remorse. In upholding the jury override, the Florida Supreme Court noted that lack of remorse could be used as evidence to negate mitigation.[72] *As with Garden*, the defendant's age was also addressed. The Florida Supreme Court noted that if age is to be afforded weight as a mitigating factor, it must be "listed with some other characteristics of the defendant or crime such as immaturity or senility."[73]

In *Burr v. State*,[74] the felony murder was committed during the course of a robbery of a convenience store and was cold, calculated and premeditated. *As in Garden*, the felony murder was committed "without any pretense of moral or legal justification."[75] The sentencing judge also found that the murder was committed to avoid a lawful arrest. Because of the presence of aggravators and the absence of any mitigation, the Florida Supreme Court held that the trial judge's death sentence was the appropriate penalty, and the jury's life recommendation was unreasonable.[76]

In *Porter v. State*,[77] the Florida Supreme Court affirmed an override of a *unanimous* jury recommendation of life. The defendant, age 22, murdered an elderly man and his wife. *As with Garden*, the felony murder occurred during the commission of a robbery. The sentencing judge found three aggravating factors, including that the murders were especially heinous, atrocious and cruel, and that the defendant killed to avoid arrest. While some mitigating circumstances were found, the sentencing judge determined that those circumstances did not outweigh the aggravating factors and sentenced the defendant to death. In affirming the override, the Florida Supreme Court stated, " 'mere disagreement with the force to be given [mitigating evidence] is an insufficient basis for challenging a sentence.' "[78]

### Conclusion

When this Court upheld the validity of the 1991 amendments to the Delaware Death Penalty Statute, we recognized that "the new law changed the roles of the judge and the jury in the sentencing phase of a capital murder trial."[79] Pursuant to the 1991 amendments, the jury "functions only in an advisory capacity."[80] The 1991 amendments provide "the *judge*, after taking the jury's recommendation into consideration, has the ultimate responsibility for determining whether the defendant will be sentenced to life imprisonment or death."[81]

The *Tedder* standard requires a jury's recommendation of life to be accorded great weight and to be followed unless the facts suggesting a sentence of death are so clear and convincing that virtually no reasonable person could differ. In Garden's case, the Superior Court judge's findings in support of his decision to impose a sentence of death, by overriding the jury recommendation of life, met the *Tedder* standard. In Garden's case, the facts sug-

72. *Id.* at 575.

73. *Id.*

74. *Burr v. State*, 466 So.2d 1051 (Fla.1985).

75. *Id.* at 1052.

76. *Id.* at 1054.

77. *Porter v. State*, 429 So.2d 293 (Fla.1983).

78. *Id.* at 296 (quoting *Quince v. State*, 414 So.2d 185, 187 (Fla.1982)).

79. *State v. Cohen*, 604 A.2d 846, 849 (Del. 1992).

80. *Id.*

81. *Id.* (emphasis added).

gesting a sentence of death are so clear and convincing that virtually no reasonable person could differ. Accordingly, I would affirm the Superior Court judge's decision to override the jury's verdict and to impose the death sentence.

Therefore, I respectfully dissent.