STRINE, Chief Justice,
dissenting:
Although I agree with my colleagues that the Superior Court committed no error by affirming Ambrose Sykes’ conviction for first degree murder, rape, and kidnapping; that Sykes’ trial counsel was ineffective under the first prong of Strickland; and that the crime itself was cruel, depraved, and heinous, I respectfully disagree that the lack of effective representation for Sykes at the critical penalty phase of his case caused him no prejudice.
One of the most important duties of a defense counsel in a capital case is to “conduct a thorough investigation of the defendant’s background” to obtain mitigating evidence.[38] The attorney investigation is essential because sentencing judges and juries “must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual — ”[39] And it is precisely when the defendant is convicted of a monstrous crime that he is most in need of a powerful, humanizing mitigation presentation. In other words, it is in circumstances such as these, when a defendant commits a cruel and depraved rape and murder of an elderly woman, that it is most vital that his attorney provide mitigation evidence to weigh against the defendant’s inexplicably evil behavior and tip the balance towards life in prison. That evidence is essential if counsel is to con *221 vince the jury and the judge to give the more merciful of the two harsh sentencing óptions: natural life in prison without possibility of parole or death by execution.
As my colleagues in the Majority-Opinion point out, -mitigation evidence is not used to excuse the crime; it is used to provide the sentencing authority with a basis to determine whether the defendant is so morally culpable as to deserve execution, Given the circumstances, evidence of this kind was of obvious importance- to representing Sykes effectively; Sykes’ trial counsel acknowledged that Sykes -did “not have a shot” in the guilt phase. When the jury and the judge are most likely to wonder how or why a person could act in such a vicious and cruel way, that is when the defense counsel’s duty to provide an answer -in the form of mitigating evidence is most important. Thus, Sykes’ trial counsel was ■ bound to take reasonable steps to discover and present all of the factors that could have influenced the jury and the sentencing judge to impose life in prison as the penalty.
The ABA Guidelines, which were in place when defense counsel was assigned to Sykes’ case, and which the U.S. Supreme Court has used as -a touchstone for reasonable attorney conduct, state that, “[a]n attorney representing the accused in a death penalty case must fully investigate the relevant facts_ [P]ro-viding quality representation in capital cases requires counsel to undertake correspondingly broad investigation and preparation.”[40] To prepare effectively, the attorney must, at “minimum,” hire a professional investigator and a mitigation specialist. ,“At the same time, counsel must consciously work , to establish the special.-rapport with the client that will be necessary for a productive professional relationship over an extended period of stress.”[41] The -Guidelines conclude that the defendant’s constitutional right to offer mitigating evidence “does nothing to fulfill its purpose unless it is understood to presuppose that the defense lawyer will unearth, develop, present, and insist on the consideration of those ‘compassionate or mitigating factors stemming from the diverse frailties of humankind.’ ”[42]
The record is clear that Sykes’ trial counsel did not attempt’ to establish any relationship with Sykes. Nor did he investigate Sykes’ background at all, such as by seeking publicly available records, and he failed to pursue obvious leads, including those discovered by his law clerk.[43] Despite the fact that this was his first time working as the lead attorney on the sentencing portion of a capital case, Sykes’ trial counsel did not hire a mitigation expert or a professional investigator. For those reasons, I agree with the Majority Opinion that the trial counsel’s mitigation case investigation was objectively unrea *222 sonable, and • that Sykes has established the first-prong under Strickland.
I part from the Majority Opinion- because I would find that the trial counsel’s deficient investigation prejudiced Sykes under Strickland’s second prong. Because the new mitigating evidence so substantially altered the evidentiary mix, I find that there is a meaningful chance that a reasonable juror would recommend, and the sentencing judge would'choose a life sentence in prison instead of execution.[44]
As the Majority Opinion acknowledges, the evidence presented during the Rule 61 hearings is very different than' the evidence that the jury heard at Sykes’ sentencing. Had Sykes’ trial counsel performed'a thorough investigation,' he would have discovered (and presented the jury with) the following evidence:
(1) Sykes experienced severe economic deprivation throughout his . childhood. When he was in elementary school, Sykes’ father, Jesse Sykes, was discharged from the military for. selling drugs, and after that, there was not enough money “really to eat.”
(2) While living together, Sykes’ parents fought constantly, physically and verbally, and they severely injured each other. Sykes , saw “quite a bit” of the violence.
(3) Sykes idolized and looked up to his father. The two were inseparable during Sykes’ childhood. But Sykes! father was not a good role model: he was a drug addict and used drugs in front of his children on a daily basis.'. He beat his wife, Sykes’ mother, and Sykes’ siblings. He éngaged in extramarital affairs and would take Sykes to see his girlfriends, one of whom was only 16.
(4) After Sykes’ father left, his mother frequently moved the family to different public housing projects in impoverished neighborhoods. Sykes often came to elementary school without shoestrings or socks, in dirty clothes that would need to be laundered on premises.
(5) Sykes’ mother neglected .his medical care. She also beat him, often leaving welts and bruises. At one point, his mother whipped him as his sisters held him down. Sykes’ mother now receives treatment for mental illness.
(6) When Sykes was 14, he left his mother’s home and moved , in with his father and his father’s girlfriend, Dawn Hawkins. Jesse Sykes severely abused Sykes during the two years that he lived in his father’s house. Hawkins testified that Jesse “punch[ed] on [Sykes]” constantly. Jesse would beat him with belt buckles, tennis rackets, and sticks, leaving Sykes with “black eyes, bruises, busted lips.”
(7) Sykes was devastated by the severe abuse imposed by the man he idolized. “Grose spent most of the time in his room crying. He would constantly cry. He would get in the bed and put the earphones on and just lay there and cry.”
(8) Jesse Sykes also violently abused his girlfriend and his girlfriend’s sister, Tara Whittlesay, who lived in the house with them. For example, Hawkins recalled that Jesse put a gun in her mouth *223 on one occasion. Whittlesay testified that Jesse sexually assaulted her from age 11 to 16, while Sykes was living in the home, and that Sykes was aware of this abuse. Sykes’ father was eventually charged with raping Whittlesay.
(9) Jesse Sykes enlisted his son as an apprentice in his criminal activity during this time. Sykes would go out on the road with his father to participate in burglaries “all the time.” Sykes was often forced to witness his father’s sexual encounters on these trips.
(10) Sykes’ mother and siblings testified that after spending two years in his father’s house, Sykes changed dramatically. He talked much less and never returned to school.
(11) Sykes suffered from brain damage in the hippocampus, possibly caused by the beatings, malnutrition, and cyanosis at birth.
Sykes’ trial counsel did not present any of this evidence to the jury because he' did not investigate Sykes’ background at all. Instead, at sentencing, he presented testimony from four family members who vaguely stated that Sykes’ childhood was “kind of difficult.” Sykes’ trial counsel also failed to present the only independent evidence that he secured during his cursory investigation: that Sykes suffered from an antisocial personality disorder.[45] Therefore, there was a material difference between the mitigation case the jury heard and the mitigation case a reasonable attorney would have presented.
As the Majority Opinion recognizes, the Superior Court erred in stating that this additional mitigating evidence had to explain or excuse Sykes’ crimes to be relevant. But the Majority Opinion fails to recognize that the Superior Court also erred in its analysis of whether prejudice occurred. The- Superior Court did not ask whether there was a reasonable chance that a reasonable sentencing authority would have given a life sentence if confronted with the new evidence. Instead, the court took a subjective approach, and concluded that it would not have imposed a different sentence. But the test, is not whether the trial judge himself would have come to a different conclusion.
The Majority Opinion compounds the trial court’s error on appeal. As it did in its recent decision in Ploof v. State,[46] this Court mistakes the application of Strickland’s prejudice prong to this procedural context. Eschewing any reliance on the Superior Court’s analysis of whether the prejudice occurs, the Majority Opinion purports to reweigh the aggravating and mitigating factors in the record itself and to reach what appears to be its own sentencing determination. Thus, the Majority Opinion states:
The aggravating circumstances which the State presented at trial are extremely strong, powerful aggravating circumstances. Our own independent, de novo reweighing of the aggravating circumstances against the totality of the mitigating circumstances leads us to the conclusion that Sykes has not met his burden of showing a reasonable probability that he would have received a *224 different sentence.... Although the additional mitigation evidence presented at the postconviction hearing strengthens the weight of the mitigating circumstances, we find that the aggravating circumstances outweigh the reconstructed mitigating circumstances.
The Majority Opinion’s focus on its own assessment of the aggravating and mitigating circumstances is contrary to the intent behind Delaware’s hybrid capital sentencing scheme. The U.S. Constitution requires that the sentencing authority always - have an option to consider mitigation evidence and to order a sentence .less than death if that authority determines that the mitigating evidence outweighs the evidence in favor of imposing a death sentence.[47] In Delaware, the sentencing authority is both the judge and jury. Although our state has diminished the role of the jury in the capital sentencing process, it has not eliminated it. To do so might violate the U.S. Constitution under the Supreme Court’s decision in Ring v. Arizona, in which the Court invalidated Arizona’s 'capital sentencing process because the sentencing judge weighed the aggravating and mitigating circumstances necessary to impose death without the aid of a.jury.[48] The Delaware capital murder statute contemplates that the jury will play a major role in sentencing by requiring that it unanimously find at least one aggravating factor before the death penalty can be imposed, and then cast’ an advisory vote on whether the aggravating factors outweigh the mitigating factors.[49] The sentencing judge must give weight to the jury’s recommendation, and if she disagrees, she must state her reasons “with specificity.”[50] And although the sentencing judge may reach a different judgment from the jury majority, I am not prepared to say that the jury’s vote is without any influence at all, especially as a Delaware trial judge has only overridden a jury vote for life once before.[51]
As explained in Ploof, the proper application of Strickland in this important context requires us to respect the reality that reasonable jurors and judges can come to different conclusions on the question of whether a life sentence or execution is the appropriate penalty for even a monstrous crime. Thus, the appropriate inquiry is not for the appellate panel to ask itself whether, having seen the new evidence, the panel thinks a death sentence is warranted. In fact, that sort of inquiry is inconsistent with, the intuition behind this Court’s recent change to Rule 82,[52] which requires that a different trial judge than originally gave a death sentence preside *225 over any new trial and sentencing, regardless of whether the judge had handled the original case in an exemplary manner. In enacting that amendment, we recognized that it is difficult for anyone to set aside a prior decision, and that in the important matter of applying the death penalty, a defendant who is entitled to a new trial or sentencing should have that proceeding handled by a new judge who has not formed an opinion about his culpability in the past.
Thus:
In situations where a Strickland violation has resulted in a failure to present mitigating evidence, the test for prejudice is whether there is a “reasonable probability” that the result of the penalty phase would have been different. “A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Although this standard is not mathematically precise, it clearly does not require that it be more likely than not that a different sentence would have resulted had the missing mitigating evidence been considered. Rather, a finding of prejudice is required if there is a substantial likelihood that a reasonable sentencing authority would have reached a different conclusion if it had the chance to consider the missing mitigating evidence. In simple, common sense terms, a reasonablé probability means that there is a meaningful chance that the new evidence would have caused a reasonable sentencing authority to give a different sentence. This inquiry is an objective one that focuses on what effect the evidence could have on a reasonable sentencing authority.[53]
In other words, we must determine whether there is a meaningful chance that the evidence omitted due to the Strickland violation, including evidence of Sykes’ severe childhood abuse, economic deprivation, and forced participation in crime by his father, could have caused a reasonable juror or sentencing judge to conclude that the balance of aggravating and mitigating factors weighed in favor of life in prison. In this case, the undiscovered evidence of horrific abuse was so different than the evidence presented to the jury and judge in the first instance that I cannot conclude that there is no reasonable probability that the new evidence would not have influenced a reasonable jury and judge’s appraisal of Sykes’ culpability. A reasonable juror and reasonable judge could decide that although Sykes committed a monstrous, inexcusable act, the compelling evidence that his most important role models inculcated a propensity toward deceit, violence, sexual disrespect, and callous disregard for women indicated a lesser degree of moral culpability and that Sykes deserved the comparatively more merciful sentence of natural life in prison. Supporting this conclusion is the reality that the State did not put in any evidence at the sentencing hearing that Sykes presented a danger to his captors in prison. In fact, the only evidence in the sentencing record was that Sykes had adjusted well to his confinement and was not a problematic inmate. Thus, a reasonable juror and judge could conclude that so long as Sykes *226 served out his life in prison, he presented a low risk of further harm to anyone.
Accordingly, I would remand the case for a re-trial of the penalty phase.

. Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

. 21A Am.Jur.2d Criminal Law § 894.

. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, February 2003.

. Id.

. Id. (quoting Louis D. Bilionis & Richard A. Rosen, Lawyers, Arbitrariness, and the Eighth Amendment, 75 Tex. L.Rev. 1301, 1316 (1997) (quoting Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (opinion of Stewart, Powell, & Stevens, JJ))).

.As the Majority Opinion points out, the clerk set forth a number of potential avenues for mitigation, such as severe abuse by Sykes’ mother and father, ‘Sykes’ educational • and behavioral problems, social issues (such as a lack of friends as a child), economic deprivation, brain damage, and a poor relationship with his father. Sykes’ defense attorney did not pursue any of these avenues and did not present the jury with this evidence.

. Under the Strickland test, the test of prejudice is whether there is a "reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome”—a lower standard than "more likely than not.” Id. In other words, a reasonable probability exists when there is a meaningful chance that a reasonable juror and judge would have reached a different decision had they been able to consider the omitted mitigation evidence.

. At oral argument, the State discounted the value of the psychological diagnosis as a mitigating factor, claiming that it could have done more harm than good. But there is no reason to think that the jury would have not been positively influenced by the diagnosis of Sykes as having antisocial personality disorder when combined with the evidence of severe abuse. And the fact that Sykes had antisocial personality disorder has a nexus to the crimes committed by Sykes, which the State admitted is the strongest type of mitigating evidence.

. 75 A.3d 840 (Del.2013).

. E.g., Eddings v. Oklahoma, 455 U.S. 104, 105, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (“[W]e conclude that the Eighth and Fourteenth Amendments require that the sentence ... not be precluded from considering, as a mitigating factor, any aspect of a defendant’s character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.”),

. 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); see also Brice v. State, 815 A.2d 314 (Del.2003) (upholding Delaware's hybrid capital sentencing scheme because of the role of the jury in weighing the aggravating and mitigating circumstances).

. 11 Del. C. § 4209(c).

. 11 Del. C. § 4209(d).

. See Garden v. State, 815 A.2d 327, 345 (Del.2003), rev’d and remanded, Garden v. State, 844 A.2d 311 (Del.2004); see also Ross Kleinstuber, "Only A Recommendation”: How Delaware Capital Sentencing Law Subverts Meaningful Deliberations and Jurors’ Feelings of Responsibility, 19 Widener L.Rev. 321 (2013).

. Supr. Ct. R. 82(b).

. Ploof, 75 A.3d 840, 874-75 (dissent) (internal citations omitted). See also Strickland v. Washington, 466 U.S. 668, 694-95, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision. It should not depend on the idiosyncrasies of the particular decisionmaker, such as unusual propensities toward harshness or leniency. Although these factors may actually have entered into counsel's selection of strategies and, to that limited extent, may thus affect the performance inquiry, they are irrelevant to the prejudice inquiry.”).